961 A.2d 119

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**William L. WRIGHT, III, Appellant.**

Supreme Court of Pennsylvania.

Argued March 3, 2004.

Decided Dec. 22, 2008.

---

272

284

Ralph Thomas Forr, Esq., for William L. Wright, III.

David C. Gorman, Esq., Richard A. Consiglio, Esq., Blair County District Attorney's Office, Amy Zapp, Esq., State of Pennsylvania District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice EAKIN.

This is a direct appeal from a death sentence imposed following appellant's conviction of first degree murder, simple assault, aggravated assault, two counts of recklessly endangering another person, burglary, and criminal trespass.[1] At the penalty phase, the jury found two aggravating circumstances and one mitigating circumstance.[2] The jury found the aggravating circumstances outweighed the mitigating circumstance and imposed a death sentence for appellant's first degree murder conviction. Appellant filed post-sentence motions,

1. 18 Pa.C.S. §§ 2502(a), 2701, 2702, 2705, 3502, and 3503 respectively.

2. The two aggravating circumstances were 42 Pa.C.S. § 9711(d)(6) (defendant committed killing while in perpetration of felony) and 42 Pa.C.S. § 9711(d)(7) (during commission of offense, defendant knowingly created grave risk of death to another person in addition to victim of offense). The mitigating circumstance was 42 Pa.C.S. § 9711(e)(2) (defendant was under influence of extreme mental or emotional disturbance).

which were denied. This appeal followed.[3] We affirm appellant's convictions and death sentence.

## FACTUAL HISTORY

Tammy Mowery and her husband, James Mowery, had two children. In March, 1998, the couple separated; Mrs. Mowery began a romantic relationship with appellant and became pregnant with his child. The Mowerys reconciled in July, 1998, after which they were victims of several acts of vandalism, including the killing of the family's pet rabbit; they blamed appellant, but he was never charged. At some point, appellant moved into his mother's house, next door to the Mowerys.

In the early morning of Thanksgiving Day, November 26, 1998, Mrs. Mowery saw appellant near the lot where the Mowerys' vehicle was parked. Afterward, Mr. Mowery discovered their vehicle's tires had been flattened. Assuming appellant was responsible, the Mowerys called 911 around 4:00 a.m.; Officer Koehle of the Altoona Police Department investigated, but appellant was not interviewed or arrested.

Approximately an hour later, the Mowerys saw appellant near their property again. Mr. Mowery called 911 at 5:20 a.m. and was told the police were at another crime scene. The Mowerys went outside to confront appellant. The three argued about the tires and the unborn child;[4] the Mowerys told appellant they had called the police. The argument ended, and the Mowerys went inside.

A few minutes later, appellant telephoned the Mowerys. Mrs. Mowery hung up on appellant, but he called back and left a message that was ultimately deleted from the Mowerys' answering machine. Appellant then called 911 and City Hall at 5:51 a.m. to speak to the officer who had been at the

3. Pursuant to 42 Pa.C.S § 9711(h)(1), this Court has automatic jurisdiction.

4. The trial court suggests Mr. Mowery's second 911 call was made after the argument, but Mrs. Mowery testified Mr. Mowery placed the call prior to the argument. *C.f.* Trial Court Opinion, 10/29/02, at 3, and N.T. Trial, 4/13/00, at 126–27.

Mowery home earlier; he was told a citation would be issued against him.

When Mr. Mowery saw appellant standing in the Mowerys' backyard, he contacted 911 a third time at 6:41 a.m., and was advised police would respond. Mr. Mowery called 911 a fourth time at 6:43 a.m. The tape of that call recorded Mr. Mowery's report that appellant was breaking into the Mowerys' house, shots being fired, and Mrs. Mowery screaming. The 911 operator again told Mr. Mowery the police were on the way. At 6:47 a.m., the Mowerys' answering machine recorded a call from the 911 operator.

Mrs. Mowery was the only witness to testify to the events inside the house. She testified that while appellant was breaking in, the Mowerys ran to their bedroom where their six-year-old son was sleeping. Mr. Mowery went into the closet before appellant reached the bedroom. Appellant apparently cut his hand on the door knob of the Mowerys' house, which he shot to gain entry, and his route from the back door to the bedroom was later traced by his blood stains. Mrs. Mowery, still pregnant with appellant's child, locked the door to the room and attempted to hide. Appellant broke open the bedroom door and had a brief exchange with Mrs. Mowery during which he put his gun to her head.

Appellant found Mr. Mowery in the closet and shot him four times. After emptying his pistol, he reloaded and shot Mr. Mowery once more. He then turned to Mrs. Mowery and said something to the effect of "I told you this was gonna happen." N.T. Trial, 4/13/00, at 139. As he was speaking, he gestured with the gun in his hand in the direction of Mrs. Mowery and her son. Appellant then left the room, and Mrs. Mowery called 911 at 6:49 a.m. to report her husband had been shot. At approximately the same time, the police arrived and saw appellant leaving in his Jeep.[5]

5. A paperboy testified he saw a man go between the Mowerys' house and appellant's mother's house, and heard approximately three gunshots around 6:45 a.m. Neighbors in the apartment above appellant's mother witnessed the initial argument in the backyard; they were awakened by the gun fire around the time appellant shot his way into

Police followed appellant on a low-speed chase for approximately 15 minutes until he arrived at the home of his former girlfriend. With the murder weapon in his hand, appellant went to the porch and began knocking on the door. Officer Koehle ordered him to drop the gun and step away from the door. Appellant instead aimed the gun at the officers as they raised their weapons against him. Appellant remained in a standoff with the officers for approximately 30 minutes. While Officer Kimmen negotiated with appellant, appellant stated he had just "toasted a guy" and did not want to go to jail. Eventually the officer convinced appellant to give up his weapon, and police arrested him. He had the loaded murder weapon on his person along with an empty clip, approximately 60 rounds of ammunition, a Taser gun, and a can of pepper spray. After being treated at the hospital for his hand injuries, appellant was taken to Blair County Prison.

**PROCEDURAL HISTORY**

Prior to the December 2, 1998 preliminary hearing, the trial court appointed public defender John Sifford to represent appellant. Attorney Sifford reported appellant did not recall the incidents in question. During the pre-trial period, appellant was hospitalized at least twice due to prison officials' concerns about his mental health and counsel's request for a review of his competency. In March, 1999, the court appointed Attorney Thomas Hooper as defense counsel due to a conflict between appellant and the public defender's office. In February, 2000, appellant withdrew a previously filed petition for a competency determination and indicated his desire to proceed to trial.

Appellant filed a motion requesting the jury be empaneled from outside Blair County, which the trial court granted. Prior to trial, a jury for an unrelated Blair County death penalty case was scheduled to be selected in Lebanon County in April, 2000, but that defendant entered a plea, obviating the need for a trial. Appellant's trial, originally scheduled for

the Mowerys' home. They also heard what they described as the distinctive sound of appellant's Jeep and saw appellant drive away; they confirmed the police arrived immediately after appellant left.

June, 2000, was moved to April to take advantage of the already scheduled process for choosing a Lebanon County jury. The court appointed Attorney Steven Passarello, who had prepared for the other death penalty case, as co-counsel to assist Attorney Hooper, and Attorney Kirk Kling was appointed as co-counsel to prepare for the penalty phase. Both attorneys joined the case approximately one month prior to trial; both filed motions for continuances which were denied. Jury selection occurred in Lebanon County March 20 through March 24, 2000. Trial occurred in Blair County April 10 through April 19, 2000. The court sequestered the jury during the trial.

Defense counsel challenged the Commonwealth's theory of the case primarily through cross-examination, particularly of Mrs. Mowery, the forensic pathologist who performed the autopsy, and the arresting officers. The defense also presented the testimony of a neighbor who stated he heard the Mowerys arguing during the summer months of either 1997 or 1998, not on the morning of the murder, and the testimony of an investigator who created a diagram of the Mowerys' house, which was used to buttress the defense's theory of the case. Appellant did not testify.

During closing arguments, defense counsel questioned Mrs. Mowery's characterization of the marriage as "wonderful" and hypothesized that after the argument in the backyard with appellant, the Mowerys argued—possibly violently—between themselves. They posited appellant, fearing for the safety of the woman carrying his child, broke into the house by shooting the locked door. They suggested Mrs. Mowery stayed downstairs in an attempt to calm appellant down and convince appellant to give her the gun. According to the theory, Mrs. Mowery went upstairs only to find Mr. Mowery livid in response to appellant's presence in the house. Potentially fearing for her own safety, Mrs. Mowery shot Mr. Mowery. Hearing the gun fire, appellant ran up to the bedroom and broke open the locked door, not knowing who had been shot. Counsel suggested this theory explained why appellant's blood was found on a path directly from the kitchen to the bedroom

rather than all over the house, which counsel suggested would be expected if appellant had been searching for the Mowerys. Counsel argued appellant picked up the gun, which Mrs. Mowery had dropped. According to counsel, Mrs. Mowery told appellant to "get out," which she was heard saying on the tape of the 911 call before the operator came on the line. Mrs. Mowery testified she had directed the comment toward her children.

Counsel also questioned the veracity of the police officers' testimony concerning appellant's alleged "I toasted a guy" confession, noting Officer Kimmen amended his report to include the confession after originally omitting it, and Officer Koehle previously testified at the suppression hearing that he could not hear the conversation between Officer Kimmen and appellant, even though at trial he testified he heard the part of the conversation containing the confession.

The jury found appellant guilty as stated above. He was sentenced to death for first degree murder, and received a consecutive aggregate sentence of 14 to 28 years imprisonment for his other convictions. On June 16, 2000, the court appointed Attorney Thomas Forr as appellate counsel. Attorney Forr filed a number of post-sentence motions. Following hearings, the trial court denied all motions. This appeal followed.

## DISCUSSION

### Sufficiency of the Evidence

■ We begin by independently reviewing the evidence to ensure it is sufficient to support appellant's first degree murder conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) (this Court undertakes review of sufficiency of evidence in every case where death penalty is imposed). When reviewing the sufficiency of the evidence, we must determine whether the evidence at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to establish all elements of the offense beyond a

reasonable doubt. *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 864 (2000).

A person is guilty of first degree murder where the Commonwealth proves: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. *See* 18 Pa.C.S. § 2502(a); *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the victims body. *Commonwealth v. Fletcher,* 561 Pa. 266, 750 A.2d 261, 267 (2000).

At trial, the Commonwealth presented compelling evidence of appellant's guilt: eyewitnesses, circumstances, an unassailable time-line, motive, forensics, and a confession. Through the 911 tapes, a six-minute time-line was established, starting with appellant shooting his way into the home. The jury heard the 911 tape of Mr. Mowery yelling that appellant was shooting his way into the home; the shots and Mrs. Mowery's screams were audible. Appellant's blood was tracked from the back door to the bedroom where the Mowerys fled. Mrs. Mowery testified appellant broke into the bedroom where she, her husband, and her six-year-old son were attempting to hide, waved the gun in their direction, and once he found Mr. Mowery in the closet, shot him repeatedly, and reloaded before shooting him again. Appellant changed the clip to reload the gun; his blood was found inside the gun. Appellant shot Mr. Mowery three times in the back and twice in the head. The six-minute time-line concluded with Mrs. Mowery calling 911 to tell the operator her husband had just been shot; at the same time, police arrived to see appellant leaving the scene. After a low-speed chase and a 30–minute standoff during which appellant stated he just "toasted a guy" and did not want to go to jail, appellant was apprehended with

the murder weapon, a Taser gun, pepper spray, 60 rounds of ammunition, and the empty clip on his person.

This evidence, and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth, supports appellant's first degree murder conviction. Mr. Mowery was unlawfully killed; there is nothing in the record to support the legal justification for use of deadly force against him. Mrs. Mowery's testimony, as well as the other evidence, including the confession, identified appellant as the person responsible for deliberately shooting Mr. Mowery. Appellant shot Mr. Mowery three times in vital body parts, reloaded, and shot him again; the evidence supports the jury's finding of a specific intent to kill. *See* 18 Pa.C.S. § 2502(d); *Spotz,* at 1283; *Fletcher,* at 267.

■ In reaching the verdict, the jury was free to weigh and reject the questions trial counsel raised concerning Mrs. Mowery's and the police officers' credibility.[6] We will not disturb the jury's credibility determinations. *See Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 630 (1995) (assertion that inconsistencies rendered witness not credible meritless because credibility is for jury to determine).

■ Turning to appellant's other claims, we note he separates the issues into three categories:[7] due process, trial

6. The trial court, hearing the same evidence as the jury, found appellant's version of events implausible, noting: "[T]he Commonwealth's evidence demonstrating guilt was unprecedented in our experience. In truth, they came close to showing both the guilt of the [appellant] and the circumstances leading up to [Mr. Mowery]'s death with *absolute certainty."* Trial Court Opinion, 10/29/02, at 5 (emphasis added).

7. Appellant raises approximately 60 issues. We note:

This Court is aware of the felt need to leave no stone unturned when counsel presents a capital appeal. However, we note that the quality of representation is not measured by the number of issues raised. It is not necessary to raise patently unavailing matters in order to ward off fears of a later finding of ineffectiveness; a good attorney will not disguise and thus weaken good points by camouflaging them in a flurry of makeweight issues which clearly have no merit.

*Commonwealth v. Williams,* 581 Pa. 57, 863 A.2d 505, 510 n. 5 (2004); *see Commonwealth v. Robinson,* 581 Pa. 154, 864 A.2d 460, 479 n. 28 (2004) ("While we certainly understand the duty of the attorney to be a zealous advocate, we pose that conduct such as what we presently

error, and ineffective assistance of counsel. We will address them in turn, reordering the issues within these categories where appropriate for ease of discussion.

## Due Process

■ Appellant alleges several due process violations, relying on the Fifth Amendment of the United States Constitution[8] as well as Article 1, § 9 of the Pennsylvania Constitution.[9] A "due process inquiry, in its most general form, entails an assessment as to whether the challenged proceeding or conduct 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental' and that 'define[s] the community's sense of fair play and decency.'" *Commonwealth v. Kratsas*, 564 Pa. 36, 764 A.2d 20, 27 (2001) (citation omitted). While not capable of an exact definition, basic elements of procedural due process are adequate notice, the opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case. *Commonwealth v. Thompson*, 444 Pa. 312, 281 A.2d 856, 858 (1971).

Appellant alleges co-counsel had insufficient time to prepare for trial. Specifically, he argues the following violated his due process rights: Attorney Passarello was appointed 12 days before jury selection, Attorney Kling was appointed five days before jury selection, and requests for continuances by Attorneys Kling and Passarello were denied; newly appointed counsel had little time to prepare forensic, ballistic, and miti-

encounter does not advance the interests of the parties and, if anything, is a disservice to the client."); *United States v. Hart*, 693 F.2d 286, 287 n. 1 (3d Cir.1982) ("Because of the inordinate number of meritless objections pressed on appeal, spotting the one bona fide issue was like finding a needle in a haystack.").

**8.** The Fifth Amendment in part provides "[n]o person shall be held to answer for a capital, or otherwise infamous crime, . . . without due process of law. . . ." U.S. Const. amend. V.

**9.** Article 1, § 9 provides:

In all criminal prosecutions the accused . . . [cannot] be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land.

Pa. Const. art. 1, § 9.

gation experts and investigators to develop effective expert testimony; and the trial was moved forward from June to April, resulting in incomplete defense investigations before trial. Because these issues are intertwined, we combine their discussion.

Appellant notes the American Bar Association (ABA) guidelines recommend two qualified trial attorneys should represent the defendant in death penalty cases. Appellant's Brief, at 22 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 2.1). This Court has never endorsed or adopted the ABA guidelines in full. *Williams*, at 527 n. 6 (Saylor, J., dissenting). We do not do so now. Appointment of additional counsel is not a right; it is within the trial court's discretion. *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 414 (2003) (citation omitted) (holding one attorney was sufficient to try entire capital case). Appointment of counsel must be made at such time as to provide counsel with adequate time to prepare for trial; however, mere brevity of time to confer with counsel before trial does not constitute ineffective assistance. *Commonwealth v. Ford*, 491 Pa. 586, 421 A.2d 1040, 1042 (1980) (citing *Commonwealth v. Hill*, 450 Pa. 477, 301 A.2d 587 (1973)); *see also Commonwealth v. Williams*, 950 A.2d 294, 313 (Pa.2008) (noting short amount of time to prepare for trial is not *per se* ineffectiveness).

Due process requires appellant be provided counsel, and Attorney Hooper was qualified to serve in that capacity. Attorney Hooper was appointed over a year prior to trial. Not one but two more attorneys were appointed to assist Attorney Hooper. Attorney Passarello testified at the post-trial motions hearing that he was prepared for trial, and having more time would not have changed the defense. N.T. Post–Trial Motions, 5/3/01, at 182, 203. Attorney Kling was appointed to handle only the penalty phase; he was present during jury selection and the entire guilt phase. Attorney Kling's mitigation expert discovered no mitigating circumstances; counsel was aware of this nearly three weeks prior to the penalty phase. The problem was not lack of time; it was

the lack of mitigation discovered by the expert. *See* Trial Court Opinion, 10/29/02, at 18. As due process was satisfied by appointing Attorney Hooper, appointing additional counsel closer to the time of trial cannot be construed as a denial of due process. *See id.*, at 17.

■■■■■ With respect to a continuance, "[t]he denial of a request for a continuance is within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion." *Commonwealth v. Busanet*, 572 Pa. 535, 817 A.2d 1060, 1076 (2002). In determining whether denial of a continuance in a criminal case was an abuse of discretion, we consider the nature of the crime and the attending circumstances. *Commonwealth v. Scott*, 469 Pa. 258, 365 A.2d 140, 143 (1976). We also have regard for the orderly administration of justice and the criminal defendant's right to have adequate time to prepare a defense. *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395, 403 (1994).

■■■■ Attorney Hooper had more than a year to prepare, and the case was dated when the continuance was requested.[10] Trial Court Opinion, 10/29/02, at 45. The trial court noted, "We had no reason in the world to believe it was not in the best interest of [appellant], the Commonwealth, the witnesses, the victims, and our limited court resources to accomplish this trial during this time frame." *Id.* Nothing in the record suggests the defense investigators were unable to complete their work prior to trial. *Id.*, at 28. The experts, whom counsel chose not to call at trial, could not contradict the Commonwealth's version of the shooting to a reasonable degree of medical certainty;[11] more time to review the medical evidence would not have changed this damning fact. *Id.*, at 22. Thus, appellant does not establish the trial court abused its discretion in denying the continuance.

10. "Trial[,] . . . when the defendant is incarcerated on that case, shall commence no later than 180 days from the date on which the complaint is filed." Pa.R.Crim.P. 600(A)(2).

11. The trial court determined the forensic psychologist's testimony, that he was unaware he was evaluating a capital defendant and his evaluation would have differed if he had more time, was not credible. Trial Court Opinion, 10/29/02, at 26–27.

Appellant next claims his due process rights were violated because he had insufficient preparation time with counsel before his preliminary hearing. He claims the time he spent with Attorney Sifford the day of the hearing was inadequate to prepare him for it. Pennsylvania Rule of Criminal Procedure 122 requires counsel be appointed prior to the preliminary hearing to all defendants without financial resources or who are otherwise unable to employ counsel. Pa. R.Crim.P. 122. Due process requires counsel be provided at all "critical stages" of a criminal prosecution. *Coleman v. Alabama*, 399 U.S. 1, 7, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). A "critical stage" is one in which the accused's substantive rights may be affected. *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 821 (2004). Neither the Rules of Criminal Procedure nor due process requires the appointment be made within a specific amount of time prior to the preliminary hearing, and appellant offers no authority for this proposition.

Here, counsel was appointed just prior to the December 2, 1998 hearing; although appellant could have requested counsel as early as Monday, November 30, 1998, the first business day after his arrest, he waited until the day of the hearing to request representation. Trial Court Opinion, 10/29/02, at 8. Further, as Attorney Sifford testified, appellant had no memory of what occurred the day of the incident. N.T. Post–Trial Motions, 5/2/01, at 49, 53, 56. Thus, any potential conversations between his arrest and the date of the preliminary hearing would have been fruitless. Furthermore, appellant does not claim any specific prejudice resulting from lack of a longer meeting with Attorney Sifford. We perceive no due process violation.

Appellant also argues his due process rights were violated when, on three occasions prior to trial, the trial court denied his request to appoint new counsel because of Attorney Hooper's refusal to communicate with him.[12] Pennsylvania

12. Attorney Hooper filed a motion to withdraw as counsel, which was heard and denied simultaneously with appellant's third motion for new counsel.

Rule of Criminal Procedure 122(C) provides "[a] motion for change of counsel by a defendant for whom counsel has been appointed shall not be granted except for substantial reasons." Pa.R.Crim.P 122(C). To satisfy this standard, a defendant must demonstrate he has an irreconcilable difference with counsel that precludes counsel from representing him. *Commonwealth v. Spotz,* 562 Pa. 498, 756 A.2d 1139, 1150 (2000) (citing *Commonwealth v. Tyler,* 468 Pa. 193, 360 A.2d 617, 619 (1976)). The decision whether to appoint new counsel lies within the trial court's sound discretion. *Id.* (citing *Commonwealth v. Segers,* 460 Pa. 149, 331 A.2d 462, 465 (1975)).

Appellant asserts he and Attorney Hooper had irreconcilable differences, alleging a breakdown in communication between May and November of 1999. Attorney Hooper testified at the post-trial motions hearing that appellant met with him at least 12 times during that period, including at an arraignment in June, during numerous meetings regarding prison treatment, at a psychiatric evaluation in August, and at a hearing to discuss his transfer from county prison. N.T. Post–Trial Motions, 5/2/01, at 69–95. The trial court found appellant's claim was not credible because many of these meetings involved court appearances or were otherwise documented. Trial Court Opinion, 10/29/02, at 15. The court further noted any "communication breakdowns" stemmed from appellant's lack of cooperation and refusal to follow counsel's advice. *Id.* As appellant failed to demonstrate irreconcilable differences between Attorney Hooper and himself, the trial court did not abuse its discretion in denying appellant's request for change of counsel.

Appellant also argues the following violated his due process rights: the trial court rushed jury selection and forced counsel to exclude potentially favorable jurors without an effort at rehabilitation; appellant was incarcerated from November 26 through December 2, 1998, prior to his preliminary hearing, without having the opportunity to speak to counsel; he was denied the opportunity to meet with counsel between December 2 and December 21, 1998, while at SCI Camp Hill for a mental health evaluation; and Attorney Hooper filed pre-trial

motions without consent by or discussion with appellant. These remaining claims are included in summary fashion in appellant's list of due process issues, but he does not include any argument supporting these claims in the body of his brief, and offers no authority supporting his proposition that a new trial is necessary. It is not our obligation to formulate appellant's arguments for him; these claims are dismissed.[13]

**Trial Error**

This Court has long held "[a]lthough a perfectly conducted trial is indeed the ideal objective of our judicial process, the defendant is not necessarily entitled to relief simply because of some imperfections in the trial, so long as he has been accorded a fair trial. 'A defendant is entitled to a fair trial but not a perfect one.'" *Commonwealth v. Martinolich,* 456 Pa. 136, 318 A.2d 680, 695 (1974) (quoting *Hill,* at 590); *see also Michigan v. Tucker,* 417 U.S. 433, 446, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *United States v. Lane,* 474 U.S. 438, 445, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). If a trial error does not deprive the defendant of the fundamentals of a fair trial, his conviction will not be reversed. *Commonwealth v. Ravenell,* 448 Pa. 162, 292 A.2d 365, 369 (1972) (citing *Commonwealth v. Lopinson,* 427 Pa. 284, 234 A.2d 552, 565 (1967)); *Commonwealth v. Thomas,* 410 Pa. 160, 189 A.2d 255, 261 (1963). We are aware appellants trial was not perfect, but our species itself is not perfect; our review is not to measure perfection. Based on our examination, however, we are convinced appellant received a fair trial, and all errors are harmless in light of the overwhelming evidence of guilt.

Appellant first argues he is entitled to a new trial because the trial court erred in denying his continuance requests. Appellant does not offer additional authority or argument, but simply refers to the due process argument he already presented. *See* Appellant's Brief, at 36. As previously noted, the trial court did not abuse its discretion in refusing to grant a continuance. *See supra,* at 11–12.

---

13. Appellant resurrects some of these issues as claims of trial error and ineffective assistance of counsel; we address them in those portions of our discussion.

■ Appellant argues the trial court erred in allowing the Blair County District Attorney's Office to proceed because of a conflict of interest. In spring, 1998, Attorney Catherine Miller assisted in representing appellant in civil matters, and Mrs. Mowery accompanied appellant to a meeting with Attorney Miller. Later that year, Attorney Miller became an assistant district attorney for Blair County. Once appellant was arrested for the murder, Attorney Miller immediately notified the district attorney she could not be personally involved in this case. *See* Trial Court Opinion, 4/27/00, at 2. The trial court found Attorney Miller did not disclose any information to the district attorney's office of any knowledge she had of appellant, and her only involvement with appellant's case was purely ministerial, having recused herself from representing the Commonwealth in this matter. *Id.*, at 2–3.

■ "[A] prosecution is barred when an actual conflict of interest affecting the prosecutor exists in the case; under such circumstances a defendant need not prove actual prejudice in order to require that the conflict be removed." *Commonwealth v. Eskridge*, 529 Pa. 387, 604 A.2d 700, 702 (1992). The trial court conducted an in-depth review under the Rules of Professional Conduct and determined there was no conflict of interest. *See* Trial Court Opinion, 4/27/00, at 3 (conducting analysis under Pa.R.C.P. 1.6–1.11). The trial court found Attorney Miller's only involvement with appellant's case was in answering a phone call and providing the district attorney a message concerning the deadline for production of crime lab reports. *Id.*, at 2. The trial court found appellant failed to demonstrate any conflict and denied the request for recusal. *Id.*, at 5. Appellant does not allege any facts to rebut the trial court's finding; he merely offers bald assertions the trial court abused its discretion. As we find no such abuse, this issue is meritless.

Appellant next argues the trial court erred in failing to provide him with a transcript of jury orientation, at which he and his counsel were not present. Several jury orientations were held at the start of each day of the week-long *voir dire*, covering general information such as trial structure, daily

schedules, and general definitions of the crimes involved. Appellant claims "numerous references were made [during *voir dire* ] to the [c]ourt having off the record discussions with members of the jury panel for which neither [a]ppellant nor his counsel were present[,]" Appellant's Brief, at 34; thus, he argues he has a right to a complete trial transcript, which should include jury orientation. He also argues orientation was a critical phase of the trial, making it reversible error for him not to be present.

Although this Court has not held jury orientation is a non-critical phase of trial, other courts have so ruled. *See, e.g., State v. Delgado,* 8 Conn.App. 273, 513 A.2d 701, 704 (1986); *Gattis v. State,* 637 A.2d 808, 812 (Del.1994), *cert. denied,* 513 U.S. 843, 115 S.Ct. 132, 130 L.Ed.2d 75 (1994). Here, appellant and his counsel were *invited* to attend jury orientation, but chose not do so until the third day of *voir dire,* when the trial court *required* counsel attend; as the *voir dire* questions were repeating the information presented at orientation, it was the trial court's hope that this would allow *voir dire* to move more expediently. *See* Trial Court Opinion, 10/29/02, at 48–49. The trial court noted, "The jury orientations in our county are never matters of record. That has been true for the entire 30 years I have been a member of the trial bar, [p]ublic [d]efender's [o]ffice, and [c]ourt of this [c]ounty. If this is an error, we have never conducted an appropriate trial." *Id.,* at 48. Furthermore, "[n]o one was denied the opportunity to be present. Nothing was done without counsel and [appellant] being completely aware of it. No one, counsel or [appellant], was excluded from anything. . . . Counsel heard (ultimately) the entire orientation because *we required it.* No objection was made." *Id.,* at 49 (emphasis in original). Appellant offers no authority supporting how failure to attend jury orientation prejudiced him. Accordingly, no relief is due.[14]

14. Counsel's failure to object to the manner in which jury orientation was conducted also results in waiver of this issue. *See* Pa.R.A.P. 302(a) (issues not raised in lower court are waived and cannot be raised for first time on appeal); *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d

Appellant next argues the trial court erred in denying his request for instantaneous transcripts of Dr. Cottle and Mrs. Mowery's trial testimony so defense expert Dr. Williams could review it. This issue is presented in summary fashion in appellant's brief; he does not develop argument on it or reference where this request was made in the record. For these reasons alone, this claim fails.

■ Appellant next argues he is entitled to a new trial because the trial court erred in admitting evidence of the blood swabbed from his hands at the hospital. On the day of the murder, while appellant was under arrest, police took him to the hospital for treatment of his injured hands. Without obtaining a warrant, a police officer swabbed blood from appellant's hands and, upon appellant's admission to the hospital, took possession of his bloody clothing. Appellant argues this evidence was collected without his knowing, intelligent consent, and without a warrant; therefore, the seizure was unlawful, and the trial court should have suppressed the evidence. Appellant offers no authority supporting his proposition that a new trial is necessary under these facts, and merely refers to the Fourth Amendment and Article I, § 8's warrant requirement. *See* Appellant's Brief, at 36–37 (citing U.S. Const. amend. IV; Pa. Const. art. I, § 8).

■ The standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the record supports the factual findings and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 842 (2003). A warrantless search or seizure is *per se* unreasonable unless it falls within a specifically enumerated exception. *Commonwealth v. Wright*, 560 Pa. 34, 742 A.2d 661, 664 (1999) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Of course, probable cause must first be established:

385, 402–03 (2003) (abrogating relaxed waiver in direct capital appeals filed 30 or more days after *Freeman* was decided).

> [O]nly in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a warrantless search.
>
> Thus, a dual inquiry, both parts requiring affirmative answers must be made: first, whether there existed probable cause to search; and secondly, whether exigent circumstances can be found to excuse the obtaining of a warrant.

*Commonwealth v. Linde*, 448 Pa. 230, 293 A.2d 62, 63–64 (1972) (citations omitted).

Here, the police cited exigent circumstances as excusing the warrantless seizure; the trial court agreed. *See* Trial Court Opinion, 10/29/02, at 56 (citing Omnibus Pre–Trial Opinion, 2/29/00, at 3) (adopting exigent circumstances analysis from Omnibus Pre–Trial Opinion).

 Exigent circumstances may excuse an otherwise unconstitutional search. *Wright*, at 664. In determining whether exigent circumstances exist, one factor the court may consider is whether there is "a likelihood that evidence will be destroyed if police take the time to obtain a warrant. . . ." *Commonwealth v. Roland*, 535 Pa. 595, 637 A.2d 269, 271 (1994) (citations omitted). The trial court held the time required to obtain a warrant would have certainly risked destruction of the evidence on appellant's hands and clothing, noting:

> It is hard to imagine evidence more readily destroyed than blood on a person's hands. Further, in a hospital situation it is similarly hard to imagine a hospital admission which would have not removed [appellant's] clothes and subjected them to who knows what (i.e. storing, laundering, relatives taking, etc.). The one . . . to . . . two hours necessary to obtain a warrant would have risked all of this.

Omnibus Pre–Trial Opinion, 2/29/00, at 3. In denying the suppression motion, the trial court noted the realities and practicalities of law enforcement dictate that where exigent circumstances exist, the warrant requirement is excused. *Id.* (citing *Commonwealth v. Miller*, 490 Pa. 457, 417 A.2d 128 (1980); *Commonwealth v. Williams*, 483 Pa. 293, 396 A.2d

1177 (1978); *Commonwealth v. Wagner*, 486 Pa. 548, 406 A.2d 1026 (1979)). Accordingly, the trial court did not err in holding exigent circumstances justified seizure of evidence without a warrant, and appellant's suppression motion was properly denied.[15]

Next, appellant argues the trial court erred in admitting into evidence photographs 33, 34, and 36, showing the victim's body. Appellant contends these photographs were inflammatory, and their potential to impassion the jury clearly outweighed their evidentiary value; furthermore, they were cumulative of other evidence. Appellant's Brief, at 38 (citing *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1318 (1996)).

This Court has stated:

[P]ictures of the victim are not *per se* inadmissible. In relation to admissibility of these photographs, we have promulgated the following test:

[A] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. If an inflammatory photograph is merely cumulative of other evidence, it will not be deemed admissible.

15. The Commonwealth also argues seizure of this evidence was justified under the plain view doctrine, contending the officers had lawful access to the blood on appellant's hands and clothing, the blood and clothing were in plain view, and their incriminating character was immediately apparent. *Id.* (citing *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Commonwealth v. Grimes*, 436 Pa.Super. 535, 648 A.2d 538, 542 (1994); *Commonwealth v. McCullum*, 529 Pa. 117, 602 A.2d 313, 320 (1992) (plain view exception allowed seizure of bloody shoes within defendant's apartment without warrant)). Although the trial court stated the plain view doctrine appeared inapplicable, the Commonwealth correctly cites this exception to the warrant requirement, which would also, independent of exigent circumstances, justify the seizure of appellant's blood and clothing.

"The admissibility of photos of the corpse in a homicide case is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error." *[Commonwealth v.] Rush,* [646 A.2d 557,] 560 [ (1994) ]. As we also explained in *Rush:*

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt. Further, the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs.

*Robinson,* at 501–02 (citations omitted). Neither graphic testimony nor the pictures' gruesome nature precludes admissibility of photographs of a homicide scene. *See, e.g., Commonwealth v. Marinelli,* 547 Pa. 294, 690 A.2d 203, 217 (1997) ("While the presence of blood on the victim depicted in the photographs is unpleasant, it is not in and of itself inflammatory."); *Rush,* at 559–60 (pictures of victim's body at crime scene were admissible despite medical examiner's testimony); *Commonwealth v. Gorby,* 527 Pa. 98, 588 A.2d 902, 908 (1991) (no abuse of discretion in allowing photographs "which depicted a large gaping gash on the victim's neck as well as thirteen other knife wounds located on the victim's hands, arms, back, and chest"); *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1373–74 (1991) (no abuse of discretion in allowing photographs of victim's slashed throat, open eye, and other head injuries as evidence of specific intent to kill).

Appellant asserts the photographs of the victim's body are inflammatory, have no overwhelming evidentiary value, and are cumulative of other evidence. However, he fails to specify how they are inflammatory, why they lack evidentiary value, or what other evidence they duplicate. He merely restates the standards, in hopes this Court will formulate arguments on his behalf. The Commonwealth, on the other hand, discusses each photograph in detail, noting the limited amount of blood visible, and explains each picture's evidentiary value and individual differences. It argues they are extremely relevant, not cumulative; if inflammatory at all, their evidentiary value far outweighs any potential inflammatory nature.

The trial court explained the photographs were not cumulative, but rather illustrated the area of the shooting, position of the body, location of the shell casings, and corroborated Mrs. Mowery's testimony, which appellant contested. It admitted the photographs because "they were neither gruesome nor necessarily explicit in their portrayal of the body." Trial Court Opinion, 10/29/02, at 51. Having reviewed the photographs at issue, we agree the pictures are not unnecessarily gruesome and only show limited amounts of dried blood. We conclude the trial court did not abuse its discretion in determining the photographs were relevant and not inflammatory.

Appellant next argues the trial court erred in failing to properly sequester the jurors as they visited local attractions and attended baseball games during the course of the trial. Sequestration is a matter left within the trial court's sound discretion and may be utilized at any time during the course of trial when the interest of justice so requires. *Gorby*, at 908 (citing Pa.R.Crim.P. 1111(a) (current Rule 642)). To establish the trial court abused its discretion in denying a request to sequester the jury, appellant must show potential prejudice. *Id.* To establish potential prejudice, appellant must demonstrate the case is subject to unusual or prejudicial publicity, or the jurors are subject to extraneous influences or pressures. *Id.* (citing *Commonwealth v. Jackson*, 481 Pa. 426, 392 A.2d 1366 (1978)).

Here, the jury was sequestered, but the jurors were allowed to attend certain planned and scheduled events over Palm Sunday weekend, while accompanied by sheriffs; the trial court "thought it best to take their minds off of [the case] while making it more difficult and less likely they might discuss the evidence, commence their deliberations, or brood on what is a significant religious weekend...." Trial Court Opinion, 10/29/02, at 57. It is appellant's burden to set forth specific evidence showing the jury's attendance at these outings prejudiced him. He has not set forth any specific allegations or evidence other than a bald assertion of prejudice; therefore, his claim fails.

Appellant further argues such outings allowed jurors to "bond," such that they were not able to form independent decisions when called upon to render a verdict. The trial court stated:

There is no question that we wanted the jurors to bond. There is also no question we wanted them to independently review the evidence. Counsel make [sic] this objection as if the two are mutually exclusive. They are not. There is no question we urged the jury to bond precisely for the reason that they were going to share an important deliberation and it would be easier for them to each express their individual view if they had become more comfortable with one another and had the respect for each other which comes from that. Actually, we balanced these competing concerns in our very last comments to the jury during our charge when we noted to them as follows in closing:

* * *

None of you should hesitate to reexamine your initial point of view and to listen to the arguments of your fellow jurors and change your point of view if you become convinced that it's wrong.... *But, you know, no matter how much you do that, in the final analysis each of you has to decide the case for him or herself. Right? Because you're each going to vote.... You are very advantaged. Your sequestration has let you know each other a lot better. Many times I have to*

*give this instruction when I'm talkin' to strangers who've only been here a day and didn't have lunch together. You are well beyond that and I expect you to treat each other appropriately. And I know you will. I know you will.*
*Id.*, at 57–59 (quoting N.T. Trial, 4/17/00, at 84–85) (emphasis in original). We agree with the trial court; there is a balance between collegiality and individual autonomy of jurors when they deliberate. The trial court did not abuse its discretion in attempting to foster a degree of comfort among jurors facing the task of deliberating in a capital case that lasted nine days. As appellant has not established how this prejudiced him, his argument fails.

Appellant next argues the trial court erred in allowing the victim's family to wear buttons in the jury's presence and in designating, by posting labels on chairs, where the family should sit during trial. He claims he was prejudiced by the buttons with the victim's picture on them because they could potentially cause undue sympathy toward the victim's family. Appellant does not offer any reference to the record or in any way substantiate that these buttons were worn in court. The trial court indicated it never saw a button. *Id.*, at 59. The victim's brother testified he was positive none of the family members wore any buttons until after the penalty phase, outside the courtroom. N.T. Post–Trial Motions, 5/4/01, at 5–9. Attorney Hooper testified he remembered seeing the victim's family wearing buttons, but did not remember if it was inside the courtroom. N.T. Post–Trial Motions, 5/3/01, at 123. Attorney Passarello testified his only recollection of buttons was after trial, outside of court. *Id.*, at 165–66. Appellant does not refer to testimony or offer any affidavits proving these buttons were worn in the jury's presence. With absolutely no evidence the buttons were ever worn in front of the jury, appellant's claim fails.

Appellant also argues he was prejudiced by the seat labels directing the victim's family where to sit, as this permitted the jury to locate and sympathize with them. Appellant fails to carry his burden of proving prejudice; he merely references the pre-trial hearing when seating of the family members was

discussed and the trial court devised a seating plan to separate the victim's family from appellant's family. N.T. Pre–Trial Hearing, 4/7/00, at 4. The trial court confirmed the families were separated, but no signs were visible to the jury to designate who sat where in the courtroom. Trial Court Opinion, 10/29/02, at 60. Appellant offers no supporting authority and fails to aver facts to demonstrate trial error.

Appellant argues the trial court erred in denying his request for a mistrial based on the prosecutor's statements during closing arguments regarding appellant's failure to testify, and the curative instruction was insufficient to remedy the prejudice this statement caused. During closing, the prosecutor asserted his statement should not be interpreted as suggesting the defense needed to prove anything at trial. *See* N.T. Trial, 4/17/00, at 29. After summarizing the Commonwealth's version of events, the prosecutor discredited appellant's version by sarcastically stating:

> Tammy Mowery did it. That's why [appellant] has 60 rounds of ammunition on him, not counting what's in the gun, almost twice what a police officer would call—or carry, I'm sorry, 'cause Tammy Mowery did it. That's why [appellant] has the shells, the bullets, the live rounds. Tammy Mowery did it. That's why [appellant] had the Taser and the Pepper Spray, 'cause Tammy Mowery did it. And then, of course, he didn't say anything, but the police, of course, lying indicated to you that he basically confessed. I just toasted a guy and I know I'm going to jail. Don't try to tell me I'm not. I know what happened. But that's all made up. That's all made up. Truth is, folks, two best Commonwealth witnesses here are the *two that didn't testify in person.* Jim Mowery, who says [appellant] broke in my house shootin', and [appellant] says, yeah, I killed him.

*Id.,* at 39 (emphasis added). After further describing the Commonwealth's evidence related to the elements of the crimes charged, the prosecutor concluded, "As I said before, I suggest two of the best witnesses that were here are the ones that did not testify—[appellant], who admitted to doin' it, and Jim Mowery, who pointed out his killer, even though he's not

here to face ya and tell you that in person." *Id.,* at 46. At the close of the prosecutor's remarks, defense counsel requested a side-bar and moved for a mistrial based on references to the fact appellant did not testify. The court denied the motion, but immediately gave a cautionary instruction: "The defendant's right to remain silent . . . is absolutely in place. And you shouldn't take any of the Commonwealth's argument that you heard as in any way disturbing that right to remain silent or that burden of proof. . . . I'll talk with you in more detail about all of those. . . ." *Id.,* at 50.

 A criminal defendant's decision not to testify is protected by the Fifth Amendment of the United States Constitution [16] and Article I, § 9 of the Pennsylvania Constitution,[17] and our legislature has provided statutory protection from such references since 1887.[18] *See Griffin v. California,* 380 U.S. 609, 611, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Commonwealth v. Trivigno,* 561 Pa. 232, 750 A.2d 243, 248 (2000); *Commonwealth v. Davis,* 452 Pa. 171, 305 A.2d 715, 717 (1973). This right is vigilantly protected because we recognize such references may jeopardize the presumption of innocence in the jury's mind. *See id.,* at 717 n. 5; *see also Commonwealth v.*

16. The Fifth Amendment in part provides: "No person shall be . . . compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend. V.

17. Article 1, § 9 provides:
In all criminal prosecutions the accused . . . cannot be compelled to give evidence against himself. . . . The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself.
Pa. Const. art. 1, § 9.

18. Persons who may be compelled to testify
(a) General rule.—Except defendants actually upon trial in a criminal proceeding, any competent witness may be compelled to testify in any matter, civil or criminal; but he may not be compelled to answer any question which, in the opinion of the trial judge, would tend to incriminate him; nor may the neglect or refusal of any defendant, actually upon trial in a criminal proceeding, to offer himself as a witness, be treated as creating any presumption against him, or be adversely referred to by court or counsel during the trial.
42 Pa.C.S. § 5941(a).

*Turner,* 499 Pa. 579, 454 A.2d 537, 538–39 (1982) (reference to defendant's pre-trial silence was not harmless).

The review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. *See Commonwealth v. Simpson,* 562 Pa. 255, 754 A.2d 1264, 1272 (2000). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will ... discretion is abused." *Christianson v. Ely,* 575 Pa. 647, 838 A.2d 630, 634 (2003) (internal quotations omitted). A trial court may grant a mistrial only "where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Simpson,* at 1272.

A comment is forbidden if "the language used by the prosecutor is intended to create for the jury an adverse inference from the failure of the defendant to testify." *Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31, 39 (1998). "It is well settled that *any* comment by the prosecution or the court violates [42 Pa.C.S. § 5941] if it '... draws attention to or focuses on the fact that no one except the defendant can rebut the Commonwealth's case....'" *Davis,* at 719 (emphasis in original) (quoting *Commonwealth v. Reichard,* 211 Pa.Super. 55, 233 A.2d 603, 604 (1967)).

The Commonwealth argues these comments, taken in the context of the entire summation, were directed specifically to the evidence, not to appellant's right to remain silent. Specifically referring to the out-of-court confession that appellant "toasted" Mr. Mowery and the 911 recording in which Mr. Mowery said appellant was shooting his way into the home, the Commonwealth notes " '[a] prosecutor is permitted to vigorously argue his case so long as his comments are based upon the evidence or reasonable inferences that can be drawn therefrom.'" Commonwealth's Brief, at 24 (citing *Common-*

*wealth v. Johnson,* 719 A.2d 778, 787 (1998)). The trial court agreed:

Taken in that context, it is hard to believe anyone could take [the prosecutor's] comments to suggest the Defendant should have testified. On the contrary, they were clearly directed at the evidence in the case. That these same comments were again repeated at the conclusion of the case is of no moment. They were appropriate in the first place.... No attorney should have to apologize for commenting strongly on admitted evidence such as the confession and the 911 tape so long as it is fair. That is exactly what [the prosecutor] did taken in the context of his argument.

Trial Court Opinion, 10/29/02, at 53–54. The Commonwealth further argues the prosecutor's comments did not prejudice appellant because it had proved its case not only beyond a reasonable doubt, but beyond all doubt.

There is a fine line between vigorously arguing the evidence and drawing attention to appellant's decision not to testify. As stated above, this Court vigilantly protects the right to remain silent and recognizes references to an accused's exercise of this right may jeopardize the presumption of innocence in the jury's mind. For this reason, though we believe no impropriety was intended, we cannot find the prosecutor's comments were not inappropriate; the spirit of "oratorical flare," as characterized by the Commonwealth, must bend to the accused's fundamental right to remain silent.

However, not every reference to a defendant's failure to testify automatically requires a new trial; the verdict can still be sustained if the error was harmless. *See Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 215 (2003).[19] An error is harmless if it could not have contributed

19. In *Mitchell,* we found harmless a prosecutor's question of the defendant which referenced the defendant's post-arrest silence: "Sir, isn't it correct that this is the first time since November ninth of 1997 that you have ever told anybody publicly who killed your two cousins?" *Mitchell,* at 214. We concluded the question improperly referenced the defendant's silence, but concluded the error was harmless because the

to the verdict. *See id.,* at 214. In other words, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction. *Id.* We have found harmless error where:

"(1) the error did not prejudice the defendant or the prejudice was *de minimis;*

(2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or

(3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict."

*Commonwealth v. Young,* 561 Pa. 34, 748 A.2d 166, 193 (1999) (quoting *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344, 350 (1998)).

The Commonwealth has the burden of proving harmless error beyond a reasonable doubt. *See Mitchell,* at 215. Although not using those magic words, the Commonwealth argues the comments "did not affect the outcome of [a]ppellant's trial," and "[o]f utmost importance is the fact that there was an avalanche of evidence against the [a]ppellant to the degree that there was no doubt of his guilt and no doubt the death penalty was not only called for, but mandated." Commonwealth's Brief, at 6. Thus, the Commonwealth contends the comments "would not have created a fixed bias against [a]ppellant ... that prevented the jury from objectively weighing the evidence and rendering a true verdict. The evidence was overwhelming and a true verdict was in fact rendered." *Id.,* at 28–29; *see Young,* at 193 (harmless error found where "uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict").

uncontradicted evidence placed the defendant at the shooting, established a motive, linked the gun to the three victims, and established the defendant evaded police for 10 days despite knowing they were searching for him. *Id.,* at 215.

This was not a close case, where a remark such as the one the prosecutor made can change the flow of a trial—this trial was a river of evidence, and its flow was unaffected by this reference. The trial court summed up: "[T]he Commonwealth's evidence demonstrating guilt was unprecedented in our experience. In truth, they came close to showing both the guilt of the [d]efendant and the circumstances leading up to the victim's death with absolute certainty." Trial Court Opinion, 10/29/02, at 5; *see also id.*, at 73 ("[W]e welcome anyone to review this transcript and ask themselves whether a case could be proved with much more certainty than this one."). The prosecutor's comments, in the face of this overwhelming evidence, pale into a regrettable but insignificant blemish. *See Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61, 76 (1994) ("Assuming *arguendo* the district attorney's remarks were sufficiently prejudicial, we would still not reverse and remand for a new trial. Where evidence of guilt is overwhelming, a prejudicial remark by the prosecutor will not be grounds for reversal."). The scale was not tipped by a remark during closing—the prosecution's side of the scale was sitting on the ground, heavily laden with an "unprecedented" amount of evidence. *See* n. 6, *supra.* Thus, the error was harmless because the evidence of guilt was so overwhelming, and any prejudicial effect was so insignificant by comparison, that the error could not have contributed to the verdict.

Furthermore, the trial court's curative instructions curtailed any damage the prosecutor's reference could have caused. The court issued an immediate cautionary instruction regarding appellant's right to remain silent and the Commonwealth's burden of proof. During jury instructions, the court charged the jury at length regarding appellant's right to remain silent and specifically warned the jury against drawing any adverse inferences from the prosecutor's comments. The court elicited responses from the jurors to ensure their acknowledgment and understanding:

[I]t's entirely up to the defendant in every criminal case whether or not to testify. The defendant has an absolute right founded on the Constitution of both the United States

and the Constitution of Pennsylvania to remain silent. You must not draw any inference of guilt or any other inter- est—inference adverse to the defendant from the fact that he did not testify. You know, we talked about this in the individual *voir dire*, if you recall. . . . In the Common- wealth's closing you heard the Commonwealth attributing certain statements to the defendant at various points. Var- ious witnesses did this at different junctures. Does this change things? The fact that some statements were attrib- uted to the defendant? That now the defendant has some affirmative duty or is [sic] somehow now has to be a witness in order to explain those statements or indicate what they meant or deny those statements or put them in another context? Heck, no, it doesn't change a thing. The significance of any statement that's attributed to the defen- dant is did the Commonwealth prove that it was even made. Right? The burden remains with them. It never changes no matter what type of evidence we're listening to. So that absolute right of the defendant to remain silent, the burd— the burden remaining all the time on the Commonwealth to prove each and everything that they feel is important to their case, not the defendant's burden to prove innocence. *And I think you understand that. I see some nods. We've been over this a lot of times.* But it's very important and nothing changes it.

N.T. Trial, 4/17/00, at 58–59 (emphasis added). This instruc- tion was firm, direct, specific, comprehensive, plain, and most revealingly, acknowledged by the jury. Further, appellant has offered nothing to rebut the presumption the jury followed the trial court's instructions. *See Simpson*, at 1272 (jury is presumed to follow trial court's instructions to disregard inad- missible evidence). Accordingly, the trial court did not abuse its discretion in refusing to grant a mistrial.

██ Next, appellant argues the trial court erred in in- structing the jury it could find "any of the crimes that occurred inside" the Mowerys' house satisfied the element of burglary requiring a person to enter a structure with the intent to commit a crime therein. *See* 18 Pa.C.S. § 3502(a)

(person is guilty of burglary if he enters building or occupied structure, or separately secured or occupied portion thereof, with intent to commit crime therein). The court instructed "[i]t could be any of the crimes that *occurred* inside, but you have to be satisfied beyond a reasonable doubt to find burglary that at the time [appellant] entered he had the intention to commit at least one of these particular crimes. . . ." N.T. Trial, 4/17/00, at 79 (emphasis added). Appellant claims these instructions confused the jury and shifted the burden of proof to him to disprove his guilt regarding the other crimes he was charged with (*i.e.,* simple assault, aggravated assault, recklessly endangering another person, and criminal trespass). Although appellant does not focus his argument well, he apparently argues the trial court told the jury to assume the other crimes actually *occurred* and thus were conclusively established.

 In evaluating jury instructions, we must read the charge as a whole to determine whether it was fair or prejudicial. *Commonwealth v. Murphy,* 559 Pa. 71, 739 A.2d 141, 146 (1999). "The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Prosdocimo,* 525 Pa. 147, 578 A.2d 1273, 1274 (1990). For appellant to be entitled to a new trial, the jury instruction must have been fundamentally in error, or misled or confused the jury. *Commonwealth v. Patosky,* 440 Pa.Super. 535, 656 A.2d 499, 506 (1995). Viewed as a whole, the trial court's jury charge accurately and adequately described the law. The charge properly instructed the jury the crime of burglary requires the Commonwealth to prove beyond a reasonable doubt that appellant, contemporaneous with entering the Mowerys' home, intended to commit a crime therein. This claim fails.

Appellant next argues the trial court erred in failing to grant the demurrer Attorney Kling requested with respect to the "grave risk of danger" aggravating circumstance, *see* 42 Pa.C.S. § 9711(d)(7), during the penalty phase. Appellant cites *Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439

(1995), for the proposition that a grave risk of danger is found where other persons are in close proximity to the victim and are therefore in jeopardy of suffering real harm. *Id.*, at 457. Appellant claims he should have been granted a demurrer during the penalty phase because the Commonwealth did not prove Mrs. Mowery and her son were within the zone of danger and therefore in grave risk of danger.

▮▮▮▮ Aggravating circumstances are to be resolved by the jury; here, the jury had to determine whether during "commission of the offense [appellant] knowingly created a grave risk of death to another person in addition to the victim of the offense." 42 Pa.C.S. § 9711(d)(7). A grave risk can be found where there is potential for an errant, ricochet or "pass through" bullet; it is unnecessary the endangered bystander be in the direct line of fire in order to be in grave risk of death. *See Commonwealth v. Boxley*, 596 Pa. 620, 948 A.2d 742, 750–51 (2008). In denying the demurrer, the trial court relied on *Commonwealth v. Rios*, 546 Pa. 271, 684 A.2d 1025, 1036–37 (1996) (finding grave risk of death where defendant fired single bullet at victim who was lying on floor of enclosed bedroom). The circumstances in *Rios* were strikingly similar to those here, and we concluded an errant bullet could have struck and killed either the person on the floor next to the victim, a child on the bed, or an adult near the bed. *Id.* We stated it was not necessary the endangered person be directly in the line of fire, as the potential for a ricocheting or pass-through bullet could create the requisite risk. *Id.* In *Commonwealth v. Stevens*, 559 Pa. 171, 739 A.2d 507 (1999), we held:

> [I]n deliberating on this aggravating circumstance [the jury] should consider all of the evidence concerning the defendant's conduct at the time of the shooting and the attendant circumstances including the number of people in the bar at the time of the shooting, their relative location and proximity with reference to the defendant at the time of the shooting, *the number and direction of shots fired, the danger of ricocheted bullets, whether or not the defendant pointed the gun at another person or persons*, evidence of

the spent bullets in the bar stool, evidence of a hole in the coat of one of the patrons and whether or not that hole was caused by a bullet and *evidence of fragments found and their location* in the area of the bar.

*Id.,* at 524 (emphasis added) (quoting Trial Court's Jury Instruction, N.T. 4/29/93, at 63–64).

Here, appellant broke into the small bedroom while swinging his loaded gun in all directions, then put the gun to Mrs. Mowery's head in an effort to find out where Mr. Mowery was hiding. Once he found Mr. Mowery, he fired five shots at him, three of which went through him and one of which was never located. Mr. Mowery's body was only a few feet from the bed on which the child was lying, and shell casings were found all over the bedroom. N.T. Trial, 4/13/00, at 135–40. Considering all of this information, as we found in the similar case of *Rios,* the trial court properly left the grave risk of danger determination to the jury.

 Appellant next argues the trial court erred in failing to give an instruction as required by *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), that life in prison means life without parole, when counsel requested one at the penalty phase. "*Simmons* mandates that where future dangerousness is at issue *and* a specific request is made by the capital defendant, it is a denial of due process to refuse to tell a jury what the term life sentence means." *Commonwealth v. Chambers,* 546 Pa. 370, 685 A.2d 96, 106 (1996) (emphasis added). A *Simmons* instruction need not be given unless the Commonwealth injects the defendant's future dangerousness into the sentencing hearing. *Robinson,* 721 A.2d at 355. Here, the trial court found the Commonwealth never raised appellant's future dangerousness; therefore, *Simmons* did not apply. *See* Trial Court Opinion, 10/29/02, at 64. Appellant relies on the dissent in *Robinson,* arguing a *Simmons* instruction should be given in every death penalty case. *See Robinson,* at 356 (Flaherty, C.J., dissenting). Appellant argues Pennsylvania law should be changed; however, we recently reaffirmed that a *Simmons* instruction is only available where future dangerousness is raised and de-

fense counsel has requested such instruction. *See Common-wealth v. Moore*, 594 Pa. 619, 937 A.2d 1062, 1074 (2007). We reiterate it here.

Next, appellant argues the trial court erred in refusing to admit the records of Dr. SanGiorgio, a general practice physician, at the penalty phase; the district attorney would not stipulate to them, and Dr. SanGiorgio could not appear at the penalty phase. Appellant claims this refusal denied him the opportunity to present mitigating evidence regarding his mental health. The Commonwealth argues Dr. SanGiorgio was not qualified to offer his opinion on mental health issues. The trial court agreed there was no basis in the rules of evidence for allowing admission of these records without Dr. SanGiorgio's testimony and the opportunity to cross-examine him. Appellant did not cite any legal basis for admitting this evidence during sentencing or in his post-sentence motions, and he does not do so now. Therefore, this claim fails.

Appellant also argues he should be granted a new trial because: the questionnaire provided to potential jurors during *voir dire* was not in conformity with Pa.R.Crim.P. 1107 [20] (requiring prospective jurors to complete standard juror information questionnaire set forth in paragraph H of rule) because it improperly inquired into potential jurors' religious affiliations; the trial court permitted use of a religious test during *voir dire* concerning potential jurors' Catholic beliefs; the trial court allegedly recommended trial counsel and the Commonwealth rearrange *voir dire* questions to inquire fairly early regarding the death penalty and religious/moral beliefs; the trial court erred in admitting ballistics and DNA evidence which defense counsel was not provided with until after jury selection and immediately prior to the commencement of trial; the trial court erred in allowing the irrelevant and highly inflammatory testimony of Tammy Boston and Jean Barr regarding child custody and appellant's character; [21] the trial

20. Current Rule 632.

21. Tammy Boston and Jean Barr are the mothers of appellant's two other children. The Commonwealth theorized that appellant was frustrated with custody problems with his current children, and he antici-

court erred in admitting the 911 recordings into evidence; and the trial court erred in failing to instruct the jury appellant did not have a significant prior criminal record.

These issues were not preserved for review by lodging timely objections or requesting the instruction appellant claims should have been given. "Error may not be predicated upon a ruling that admits or excludes evidence unless ... a timely objection, motion to strike or motion in limine appears of record...." Pa.R.E. 103(a)(1). "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). *See also Freeman*, at 402–03 (abrogating relaxed waiver in direct capital appeals). Additionally, appellant has failed to include in his brief a cross-reference to the location where these issues were raised or preserved below, Pa.R.A.P. 2119(e), and an independent review of the record by this Court has not established the material was ever preserved; thus, these issues are waived. However, although waived as trial error issues, they may be reviewed as ineffectiveness claims, if properly pled and argued. Accordingly, they will be addressed in the ineffective assistance of counsel discussion which follows. *See Freeman*, at 403.

**Ineffective Assistance of Counsel**

 Appellant raises numerous claims of ineffective assistance of trial counsel. In *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), this Court announced a general rule providing a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review"

pated similar problems once Mrs. Mowery gave birth. The Commonwealth offered this testimony to support this theory and to corroborate the police officer's testimony of the standoff outside Boston's home on the morning of the murder. Appellant claims their testimony was irrelevant, prejudicial, and highly inflammatory, and their personal opinions as to his reputation and character were inadmissible. Barr testified she had a 10-year relationship with appellant, they had one child together, they had a bitter custody dispute, and appellant was familiar with custody proceedings. Boston testified similarly to Barr, and she also testified briefly to the police standoff outside of her home on the morning of the murder. Trial counsel testified at the post-trial motions hearing that they did not object to any of this testimony because it would have been overruled.

pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541 *et seq. Grant,* at 738. However, in *Bomar,* we recognized an exception to *Grant:* where ineffectiveness claims were raised in the court below, a hearing was held at which trial counsel testified, and the trial court ruled on the claims, review of an ineffectiveness claim was permissible on direct appeal. *See Bomar,* at 853. Appellant raised his claims in timely post-trial motions, hearings were held, trial counsel testified, and the trial court reviewed all of the ineffectiveness claims. Therefore, *Bomar's* exception applies, and these claims are properly reviewable on direct appeal.[22]

Trial counsel is presumed to be effective, and appellant has the burden of proving otherwise. *Commonwealth v. Williams,* 524 Pa. 218, 570 A.2d 75, 81 (1990). Appellant must prove: (1) his underlying claim is of arguable merit; (2) counsel's performance lacked a reasonable basis; and (3) counsel's action or inaction caused him prejudice. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975–77 (1987); *see also Commonwealth v. Gwynn,* 596 Pa. 398, 943 A.2d 940, 945 (2008).[23] To demonstrate prejudice, appellant must show there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. *Commonwealth v. Pierce,* 567 Pa. 186, 786 A.2d 203, 213 (2001). When it is clear the party asserting an ineffectiveness claim has failed to meet the prejudice prong of the ineffectiveness test, the claim may be dismissed on that

22. Prolix collateral claims should not be reviewed on post-verdict motions unless the defendant waives his right to PCRA review, because the PCRA does not afford the right to two collateral attacks. *See Commonwealth v. Rega,* 593 Pa. 659, 933 A.2d 997, 1032–33 (2007) (Castille, J., joined by Saylor, J., concurring) ("[P]ost-verdict motions should not become an accepted repository for laundry lists of collateral-appropriate complaints, with concomitant delay . . . all in advance of a second round of statutorily-authorized collateral attack via the PCRA as of right."); *see also Rega,* at 1029 (Cappy, C.J., concurring).

23. This "performance and prejudice" test was first enunciated in *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and was recognized in *Pierce* as the proper test under the Pennsylvania Constitution. The *Strickland* and *Pierce* standards are coextensive. *See Commonwealth v. Collins,* 957 A.2d 237, 244 n. 6 (Pa.2008) (citations omitted).

basis alone, without a determination of whether the first two prongs have been met. *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 224–25 (2007) (citation omitted). Failure to meet any prong of the test will defeat an ineffectiveness claim. *Id.*, at 224. Counsel is not ineffective for failing to raise meritless claims. *Commonwealth v. Peterkin*, 538 Pa. 455, 649 A.2d 121, 123 (1994) (citation omitted).

First, we review the claims of trial error which were waived because they were not properly preserved. Appellant challenges the modification of the standard questionnaire provided to the jury pool during *voir dire*, the inquiries made into the religious beliefs of several potential jurors, and the trial court's recommendation that counsel rearrange *voir dire* to ask death penalty, religious, and moral belief questions early. The juror information questionnaire was modified to include a question regarding the juror's religious affiliation; the questionnaire conformed to former Rule 1107 [24] in all other respects. Prior to individual *voir dire*, the trial court suggested counsel ask about religious objections to the death penalty fairly early, to expedite the selection process. During *voir dire*, several jurors were asked about the fact they were Roman Catholics, and whether they could impose the death penalty in light of their religious beliefs; they responded they did not feel they would be able to follow the law. The prosecutor and defense counsel each raised two challenges for cause, and these potential jurors were excused.

Although appellant's claim concerning the jury questionnaire's conformity with former Rule 1107 is couched in terms of ineffectiveness in his statement of issues, *see* Appellant's Brief, at 16, Issue I, he only argues ineffectiveness in terms of counsels' failure to rehabilitate jurors after they were questioned about their religious beliefs. *See id.*, at 51–52. Appellant does not argue counsels' ineffectiveness regarding his claims the trial court improperly permitted a religious test to

24. Both the former and current versions of the rule provide the question: "Do you have any religious, moral, or ethical beliefs that would prevent you from sitting in judgment in a criminal case and rendering a fair verdict?" Pa.R.Crim.P. 1107 (current Rule 632).

be used, or that it rushed *voir dire* by urging counsel to rearrange the order of their selection questions; he only argues trial court error. *See id.*, at 31–32. Accordingly, we will only address his claim of ineffectiveness for failing to rehabilitate jurors who were questioned about their beliefs.

 Appellant argues defense counsel should have attempted to rehabilitate these potential jurors; he claims the failure to do so denied him an impartial jury. The process of asking questions during *voir dire* to identify individuals who object to the death penalty and excluding those persons from the jury is known as "death-qualifying" the jury, which is proper and necessary to ensure a fair trial. *Commonwealth v. Morris*, 546 Pa. 296, 684 A.2d 1037, 1039 n. 2 (1996) (citing *Commonwealth v. Lambert*, 529 Pa. 320, 603 A.2d 568 (1992)). Being tried in a capital case before a "death-qualified" jury does not deprive the defendant of a fair and impartial jury from a representative cross-section of the community. *McCullum*, at 321. Exclusion of such jurors does not result in a jury inclined to impose death in capital murder prosecution. *Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656, 664–65 (1986).

 During the post-trial motions hearing, trial counsel testified time constraints arose during *voir dire:*

> What was happening was one side would go first, . . . we'd get through all of the other questions and then we'd spend an hour, two hours on the juror. [The prosecutor] would ask, can you impose the death penalty, they'd say no. We'd attempt to rehabilitate[,] they'd still say no and the [c]ourt would end up striking for cause.

N.T. Post–Trial Motions Hearing, 5/3/01, at 153. The trial court, being skeptical a person could be persuaded to change his position on an issue as sensitive as the death penalty, *see* Trial Court Opinion, 10/29/02, at 67–68, made clear to counsel its intention to dismiss for cause those potential jurors who expressed an inability to impose the death penalty. However, this did not relieve counsel of the duty to preserve the issue; failure to do so simply because the trial court is unlikely to

sustain the objection in that case is not a reasonable strategy. Regardless of whether counsel's action was reasonable, appellant fails to show there is a reasonable probability an objection would have led to a different outcome. Although he mentions four potential jurors stricken for cause because of their beliefs about the death penalty, he does not develop a colorable argument that an attempt to rehabilitate them would have succeeded, nor does he demonstrate the jury ultimately selected was unfair. Thus, appellant has failed to demonstrate he was prejudiced by counsel's inaction, and his claim fails.

Appellant's next claim, concerning the admission of DNA and ballistics evidence, is also couched in terms of ineffectiveness; he argues trial counsel should have requested a continuance to conduct independent testing on such evidence, which was not provided to the defense until after jury selection and immediately prior to the commencement of trial. *See* Appellant's Brief, at 15, Issue B; *id.*, at 46. He also argues trial counsel should have objected and renewed the request for continuance when this evidence was presented at trial. *See id.*, at 16, Issue K; *id.*, at 34.

Appellant asserts that in November, 1999, the trial court allocated money for a forensic expert, a ballistics expert, and an investigator, but only an investigator was hired. Once additional counsel was appointed, it was too late to obtain a DNA or ballistics expert. He argues there could be no reasonable basis for not obtaining independent experts, and he was prejudiced because no defense expert testimony was presented to compare to the conclusions of the Commonwealth's experts.[25]

**25.** Appellant contends Pa.R.Crim.P. 305(B)(1)(e) (current Pa.R.Crim.P. 573(B)(1)(e)) imposes a duty on the Commonwealth to provide the defense with results of any scientific tests, expert opinions, and reports of polygraph examinations or other physical or mental examinations of the defendant. However, former Rule 305(B)(1) stated "[i]n all court cases, on *request by the defendant* . . . the Commonwealth shall disclose to the defendant's attorney all of the following *requested items* or information, provided they are material to the instant case." *Id.*, 305(B)(1) (emphasis added). Appellant fails to assert he requested any of the materials.

Assuming they were requested, Rule 305(D) provided:

Appellant offers no authority supporting his proposition that a new trial is necessary. The trial court found defense counsel had a reasonable basis for not presenting DNA or ballistics experts. Trial counsel testified, given the Commonwealth's evidence—the 911 calls, the cut on appellant's hand, the blood in the house and on the gun, Mrs. Mowery's testimony, and the fact no one else within the home was bleeding besides Mr. Mowery—they concluded the jury would have rejected the argument that the blood found leading to the bedroom and on the gun was not appellant's. *See* N.T. Post–Trial Motions Hearing, 5/3/01, at 207–08. Therefore, it would have been pointless to seek further DNA testing on the blood. This is equally true with respect to the gun. The 911 call by Mr. Mowery identified appellant as he shot his way into the home, Mrs. Mowery's testimony confirmed this, and appellant had the gun when he was arrested. No ballistics expert could dispute this evidence without losing credibility with the jury. We have previously concluded not using testimony, in order to maintain credibility with the jury, is a reasonable trial strategy and is not ineffectiveness. *See Commonwealth v. Duffey*, 585 Pa. 493, 889 A.2d 56, 62 (2005). As appellant fails to show defense counsel had no reasonable basis for not presenting DNA or ballistics experts, his claims fail.

■ Appellant's claim the trial court erred in admitting the 911 recordings into evidence is presented as an ineffectiveness claim; he asserts counsel should have objected to this evidence. Appellant's argument consists of one sentence asserting counsel should have objected; he baldly claims the

[i]f, prior to or during trial, either party discovers additional evidence or material previously requested or ordered to be disclosed by it, which is subject to discovery or inspection under this rule, or the identity of an additional witness or witnesses, such party shall promptly notify the opposing party or the court of the additional evidence, material, or witness.

*Id.*, 305(D) (current Pa.R.Crim.P. 573(D)). The Commonwealth maintains it received the evidence in question shortly before trial commenced, and it immediately provided the evidence to defense counsel. Appellant does not rebut the assertion the evidence was provided as soon as it was available.

recordings were inflammatory, misleading, and cumulative of other evidence. He does not explain how the recordings are inflammatory or misleading, and does not offer any authority supporting why these recordings should have been excluded.

██ Pennsylvania Rule of Evidence 403 provides, "[a]lthough relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403. "Unfair prejudice" means a tendency to suggest decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially. *Id.*, Official Comment. "[T]he 911 tapes were tantamount to [Mr. Mowery] testifying from beyond the grave identifying the shooter and identifying what was taking place immediately prior to the death. There could be no better evidence submitted to the jury...." Commonwealth's Brief, at 45. "Not only were they admissible, we believe they (alone) could almost justify a conviction." Trial Court Opinion, 10/29/02, at 52. This evidence was extremely probative. It not only provided the six-minute time-line starting with appellant shooting his way into the house and ending with the police chasing him from the scene, but it also provided evidence of Mrs. Mowery's mental state and behavior, as appellant alleged she was the actual murderer. There was no danger the 911 recordings tended to suggest an improper verdict or that they diverted the jury from impartially weighing the evidence. To the contrary, the recordings focused the jury on the moments before and after the crime and assisted it in assembling all of the evidence presented. The probative value of these recordings, which were properly authenticated, dwarfed any potential danger. As appellant fails to demonstrate how he was unduly prejudiced by the admission of the 911 tape, this claim fails.

██ In conjunction with his claim the trial court should have instructed the jury concerning his lack of a significant prior criminal record, appellant argues trial counsel were

ineffective for failing to request a penalty phase instruction that, as a matter of law, appellant did not have a significant history of criminal behavior because his record included only three misdemeanors from 12 years prior to the trial. *See* Appellant's Brief, at 17, Issue W; *id.*, at 42.

As the trial court noted, whether appellant's criminal history could be characterized as "significant" was for the jury to determine. *See* Trial Court Opinion, 10/29/02, at 64. Furthermore, appellant fails to argue how he was prejudiced by counsels' inaction; he offers no authority supporting his proposition counsel was ineffective for failing to request this instruction. Accordingly, this claim fails, and we turn to appellant's remaining ineffectiveness claims.

Appellant argues counsel were ineffective for failing to adequately discuss the case with him prior to the preliminary hearing, and failing to actively communicate with him or allow him to aid in preparing his defense from May, 1999 to November, 1999. Appellant offers only bald assertions of how these alleged failures would have caused the trial's outcome to be different. *See Pierce*, 786 A.2d at 213. With respect to the alleged inadequacy of time with preliminary hearing counsel, we have already addressed this issue in connection with appellant's due process claims and concluded it was meritless. *See supra*, at 12–13. Therefore, appellant's ineffectiveness claim based on this issue fails.

With respect to May, 1999 to November, 1999, Attorney Hooper testified at the post-trial motions hearing that appellant met with him at least 12 times during that period, including at an arraignment in June, numerous meetings regarding prison treatment, a psychiatric evaluation in August, and a hearing to discuss transfer out of Blair County Prison. N.T. Post–Trial Motions, 5/2/01, at 69–95. As discussed in connection with appellant's due process claims, the trial court did not find appellant credible, *see supra*, at 13 (citing Trial Court Opinion, 10/29/02, at 15); *see also* Trial Court Opinion, 10/29/02, at 29–32, 32 ("We belabor this to show just how inaccurate [appellant]'s claims that he did not have an opportunity to discuss his case are."). Therefore, the

underlying issue on which appellant bases his ineffectiveness claim is meritless, and the claim fails.

Appellant next argues Attorneys Passarello and Kling did not have time to prepare a proper defense and did not renew their request for a continuance; as a result, he was denied effective assistance. Appellant refers to his due process arguments regarding the amount of time available to each attorney for trial preparation. The trial court found this allegation meritless, noting it addressed the underlying issue when it rejected appellant's due process claims based on lack of preparation and denial of a continuance. *See* Trial Court Opinion, 10/29/02, at 35; *see also id.*, at 18–19 (rejecting appellant's due process claim concerning alleged lack of preparation time and denial of continuance).

The trial court noted all attorneys performed very competently, and noted the only viable defense, given appellant's claim of innocence, was the theory that Mrs. Mowery shot her husband. Counsel attempted to develop this theory by cross-examining Mrs. Mowery and defense witnesses concerning marital difficulties the Mowerys had which, coupled with Mrs. Mowery's relationship with appellant, might have given her motive to commit the murder. Although counsel testified they "would [have] liked ... to have more time with the experts ...," N.T. Post–Trial Motions Hearing, 5/3/01, at 182, they conceded it would not have changed their defense, as there was "only one defense," given appellant's denial that he shot the victim. *Id.* As the trial court noted, the experts available to the defense could not contradict the Commonwealth's version of the shooting, and more time to prepare would not have altered the outcome. As a continuance would have been unavailing, counsel were not ineffective for failing to renew their request for one.

Appellant argues counsel were ineffective for failing to timely object to the prosecutor's *voir dire* questions which incorrectly stated the law regarding a diminished capacity defense based on alcohol consumption. Counsel eventually objected on the third day of jury selection, when eight jurors

had been impaneled; the trial court corrected the misstatement and provided the proper legal standard to the jury during jury instructions.

The purpose of *voir dire* is to assure the impaneling of a fair and impartial jury capable of applying the law in accordance with the trial court's instructions. *Commonwealth v. Jermyn*, 533 Pa. 194, 620 A.2d 1128, 1132 (1993). Here, the prosecutor made a misstatement, which the trial court corrected, and the proper standard was provided during the jury charge. Appellant provides no proof the jury was confused at trial. In the same vein, appellant offers no argument how this misstatement prejudiced him, and he has not carried his burden to prove ineffective assistance. This claim fails.

■ Next, appellant argues counsel were ineffective for failing to object to the prosecutor's *voir dire* questions concerning the alleged relationship between appellant and Mrs. Mowery. The prosecutor advised prospective jurors appellant and Mrs. Mowery had a sexual relationship which resulted in pregnancy, and the relationship ended because Mr. and Mrs. Mowery reconciled.[26]

The trial court found appellant's argument unpersuasive because the entire case, especially the defense strategy, was based on the relationship between appellant and the Mowerys. The prosecutor asked questions to determine potential jurors' beliefs about having children out of wedlock, extramarital relationships, and abusive marriages—all factors in the case. These questions were necessary to ensure the jurors could provide unbiased decisions in light of the relationships in-

26. The prosecutor also inquired whether the jurors could look appellant in the eye and sentence him to death if the facts warranted it. Appellant argues:

Neither counsel for the [a]ppellant nor the Commonwealth should be permitted to elicit any information or ask direct or hypothetical questions designed to disclose what a juror's impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case.

Appellant's Brief, at 50 (citing *Commonwealth v. Bentley*, 287 Pa. 539, 135 A. 310, 313 (1926)). Appellant fails to offer anything more to demonstrate how counsel's failure to object to this statement resulted in prejudice. Accordingly, this claim fails.

volved. As the trial court noted, the questions aided the defense in its theory that Mrs. Mowery murdered her husband; this theory depended on the circumstances surrounding their relationship. Meanwhile, the Commonwealth presented an avalanche of evidence of guilt at trial, and appellant does not present any proof a timely objection during *voir dire* would have changed his trial's result. This claim fails.

■ Next, appellant argues counsel were ineffective for failing to object to the prosecutor's *voir dire* questions which dealt solely with prospective jurors' ability not to have sympathy for appellant based on his looks or appearance. The prosecutor asked a prospective juror whether he would be able to look at the clean-cut, well-dressed appellant each day and "show no sympathy" in applying the law. N.T. Trial, 3/21/00, at 132. Appellant offers no authority establishing this type of questioning is impermissible, and the trial court found this claim meritless. The trial court further found these questions were offset by the defense's questions regarding sympathy towards the Mowery family who might cry or show emotion in the courtroom during trial. As these were proper questions to ensure selection of an unbiased jury, this argument is meritless.

■ Appellant next argues counsel were ineffective for failing to object to the prosecutor's opening statement that the Commonwealth had numerous other witnesses, whom it was not going to call, to support its case. Appellant argues the Commonwealth was improperly attempting to bolster its case in the jury's eyes. The trial court found this claim meritless, concluding the prosecutor was simply explaining to the jury that if one witness testified another person also witnessed certain events, he would not call the other witness to testify to the same evidence; this would prevent an unduly lengthy trial. While the prosecutor may not suggest there were non-cumulative witnesses, mention of redundant evidence is not automatically prejudicial. Further, the trial court instructed the jury that opening statements are not considered evidence. *See Commonwealth v. Ligons*, 565 Pa. 417, 773 A.2d 1231, 1238

330

(2001) (citing *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 231 (1995)). Accordingly, this meritless claim fails.

■ Appellant next argues counsel were ineffective for failing to object to the prosecutor's reference in his opening statement to incidents happening at the Mowerys' residence prior to the murder, including the killing of the Mowerys' rabbit, the flattening of their car tires, and other acts of vandalism. He argues these were prior bad acts for which he was never charged or convicted, and as such, were inadmissible to prove he committed the murder. Appellant's Brief, at 53 (citing *Commonwealth v. Donahue*, 519 Pa. 532, 549 A.2d 121, 125 (1988);) *see also* Pa.R.E. 404(b)(1) (evidence of other crimes, wrongs, or acts inadmissible to prove character of person to show he acted in conformity therewith). He contends the jury gave much weight to the prosecutor's insinuations, due to the very nature of his position as a prosecutor, resulting in prejudice.

As previously noted, the trial court clearly instructed the jury that opening statements are not evidence and are not to be considered evidence. *See Ligons*, at 1238. After the opening statement, the Commonwealth offered Mrs. Mowery's testimony concerning these occurrences; she testified regarding appellant's threatening demeanor when he was in their presence. Appellant cross-examined Mrs. Mowery with respect to these occurrences. Counsel testified they viewed this testimony as evidence of the Mowery household's state of mind around the time of the murder, and the trial court agreed, noting appellant was never directly accused of being the perpetrator of the vandalistic acts. Appellant offers no proof he was prejudiced by the reference and testimony about these acts, which were part of the history of events leading up to the day of the crime; therefore, his claim fails.

■ Appellant next argues counsel were ineffective for failing to call additional witnesses concerning the Mowerys' relationship. The defense's strategy was to inject reasonable doubt into the Commonwealth's case by presenting evidence suggesting Mrs. Mowery killed Mr. Mowery. To that end, the

defense presented evidence attempting to discredit Mrs. Mowery's testimony that her marriage was wonderful. However, appellant argues counsel were ineffective for failing to call Barb Leskie, Mrs. Mowery's co-worker, who he asserts would have testified that on several occasions, Mrs. Mowery told her Mr. Mowery was abusive. He argues the failure to call Leskie was so prejudicial, it denied him a fair trial.

■ In order to prevail on a claim of ineffectiveness for failing to call a witness, a defendant must prove, in addition to meeting the three *Pierce* requirements, that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew or should have known of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the witness's testimony was so prejudicial as to have denied him a fair trial. *Commonwealth v. Bolden,* 562 Pa. 94, 753 A.2d 793, 798 (2000) (citing *Commonwealth v. Crawley,* 541 Pa. 408, 663 A.2d 676, 679–80 (1995)).

At appellant's post-trial motions hearing, Leskie testified Mrs. Mowery on one occasion had "some marks on her arm" and on another occasion "a small little mark on the side of her face" from fighting with Mr. Mowery. N.T. Post–Trial Motions Hearing, 5/2/01, at 3. She further testified she was not aware of any problems between the Mowerys after they reconciled. Mrs. Mowery testified their relationship was "pretty much perfect," but they did sometimes argue. N.T. Trial, 4/13/00, at 105. She further testified Mr. Mowery once slapped her so hard she fell to the floor, and two days later sought medical attention for her injuries; she also testified she told appellant about several fights between her and Mr. Mowery. Defense witness Clifford Lemaster, the Mowerys' neighbor, testified that on several occasions he and his wife were awakened late at night by the noise of adults fighting. Each time, he determined the fighting was coming from the Mowerys' home. Since Mrs. Mowery and Lemaster both testified the Mowerys fought, and Mrs. Mowery testified sometimes the arguments were physical, Leskie's testimony would have been cumulative and would hardly have changed

the trial's result. Having failed to establish prejudice, appellant is not entitled to relief on this claim.

Appellant next argues counsel were ineffective for advising him not to testify at trial because forensic expert Dr. Williams was going to testify, offering the same version of events to which appellant would testify. Appellant testified at the post-trial motions hearing that at the time he told the trial court he was not going to testify, he still thought Dr. Williams was going to testify. The trial court found appellant's claim incredible, indicating appellant was fully aware, at the time he decided not to testify, that Dr. Williams was not testifying; it was the sixth day of trial, and appellant knew he was the last witness and Dr. Williams was not testifying. Additionally, appellant knowingly and voluntarily waived his right to testify, as shown by the following colloquy:

BY ATTORNEY PASSARELLO:

Thank you, Your Honor.

The first thing I'd like to mention to the Court on the record is that we have discussed with Mr. Wright his absolute right to testify in his own defense. We have discussed the options and the pros and cons to doing that and it is my understanding that Mr. Wright has agreed to our advice, which would be to not testify in this case. I just wanted to place that on the record.

BY THE COURT:

And, of course, Mr. Wright together with the rest of counsel are present at this time.

BY ATTORNEY PASSARELLO:

That's correct, Your Honor. And I would just ask on the record if the Court would indicate—I believe he made a positive response.

BY THE COURT:

All right. That is fine. The—Mr. Wright, you nodded in agreement. You're accepting the counsel's advice and your own—you've talked about this obviously and come to a group decision I'm sure. The decision is that you will not testify in the matter. Is that correct?

BY [APPELLANT]:

Yes, your Honor.

BY THE COURT:

And you're comfortable with that in light of all the advice you've received and the thinking you've obviously put into it, too.

BY [APPELLANT]:

That's correct.

N.T. Trial, 4/17/00, at 4–5.

As the record demonstrates there was an adequate colloquy, and we will not disturb the trial court's credibility determination concerning appellant's assertion he did not know the expert was not going to testify, this claim fails.

■ Appellant next argues counsel were ineffective for failing to object to the prosecutor's statement during closing argument that appellant's blood was found inside the gun. He argues the evidence only showed the blood was on the outside of the gun and its clip, not inside the gun where the clip is inserted. Appellant offers no authority supporting his proposition that a new trial is necessary under these facts. The trial court held this claim was "wordsmithing at its worst," because a bloody clip inserted within a gun is arguably blood within the gun. Trial Court Opinion, 10/29/02, at 43–44. With strong evidence showing appellant shot his way into the house, cut his hand, and was arrested with the gun, there is no dispute his blood could have found its way inside the gun, even if, as the defense presented, Mrs. Mowery shot Mr. Mowery. Appellant has failed to prove this issue is of arguable merit or how counsels' failure to object prejudiced him.

■ Next, appellant argues counsel were ineffective for failing to object to criminal trespass being used to establish the aggravating circumstance of committing the killing during the course or perpetration of a felony, 42 Pa.C.S. § 9711(d)(6). Appellant argues the definition of "perpetration of a felony" used to define second degree murder, 18 Pa.C.S. § 2502(b), (d) (defining second degree murder as homicide committed while

engaged in perpetration of felony), applies to the (d)(6) aggravator. Section 2502(d) limits "perpetration of a felony" to include "robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa.C.S. § 2502(d). However, this Court has held "felony," as used in the (d)(6) aggravator, "is adequately defined by reference to our Crimes Code which specifically designates those crimes which are felonies." *Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861, 871 (1990) (citing 18 Pa.C.S. § 101 *et seq.*); *see also Commonwealth v. Robinson*, 583 Pa. 358, 877 A.2d 433, 445–46 (2005) (citing *Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, 102 (1995)). As the Crimes Code classifies criminal trespass as a second or third degree felony, *see* 18 Pa.C.S. § 3503(a)(2), this offense was properly used to establish the (d)(6) aggravator, and appellant's issue is meritless.

 Appellant argues counsel were ineffective for failing to call forensic expert Dr. Karl Williams to refute the evidence the shots in the closet's drywall demonstrated a grave risk of danger to the other people in the room. To support the "grave risk of death" aggravating circumstance in § 9711(d)(7), the Commonwealth presented evidence appellant fired five bullets and one bullet was never recovered. As previously noted, a grave risk can be found where there is potential for an "errant, ricochet or 'pass through' bullet." *See Commonwealth v. Smith*, 518 Pa. 15, 540 A.2d 246, 260 (1988).

To prevail on a claim of ineffectiveness for failing to call a witness, appellant must not only establish the three *Pierce* prongs, but also the five *Bolden* prongs. *See Bolden*, at 798 (citing *Crawley*, at 679–80). Appellant fails to assert any facts to establish Dr. Williams was willing and prepared to testify at the time of trial, or that such testimony would have changed the trial's outcome. He argues Dr. Williams testified at the post-trial motions hearing that, assuming all bullets were fired inside the closet, there was no grave risk to Mrs. Mowery or her child. However, the Commonwealth established on cross-examination that at the time of trial, Dr. Williams was not prepared to testify to a reasonable degree of certainty all

shots were fired within the closet. The Commonwealth's theory was that one shot was fired outside the closet; the evidence supported this conclusion, as one bullet was never found. At the time of trial, there was a factual dispute over this issue; Dr. Williams could not conclusively testify all shots were fired into the closet and no grave risk existed. Thus, appellant fails to demonstrate this witness was prepared to testify at trial or his purported testimony would have changed the trial's outcome. Accordingly, this claim fails.

Appellant further argues counsel were ineffective for failing to object to the trial court's charge regarding the "grave risk of death" aggravating circumstance. Appellant argues counsel should have objected to the charge because the term "grave risk of death" is vague and ambiguous and therefore unconstitutional. He argues that without a specific definition of "grave risk," juries will inconsistently apply this aggravator. Appellant's argument is unpersuasive, as this Court has already held the "grave risk of death" aggravator in § 9711(d)(7) is not unconstitutionally vague on its face. *Stevens*, at 524 (citing *Smith*, at 261). Counsel cannot be found ineffective for failing to raise meritless objections.

Appellant also alleges counsel were ineffective for: failing to object to the prosecutor's closing remarks regarding appellant's failure to testify at trial; failing to exercise all available peremptory challenges, thereby possibly incurring waiver of jury selection issues which were evident from the record; cross-examination of Dr. Cottle at the preliminary hearing; promising to obtain expert opinions and failing to provide the same; failing to provide appellant an opportunity to interview the experts; failing to request a jury instruction regarding the voluntariness of appellant's confession; failing to introduce appellant's taped conversation with Officer Koehle, in which appellant discussed the complaints lodged against him by Mr. Mowery; failing to attempt to rehabilitate jurors who voiced opposition to the death penalty; failing to object to the Mowery family wearing buttons at trial; allowing labels to designate where family members were sitting; and failing to subpoena Dr. SanGiorgio or his business records keeper to

testify to the information contained in appellant's medical records. These remaining claims are included in summary fashion in appellant's brief, *see* Appellant's Brief, at 15–17, Issues A, H, O, Q, R, S, Y, Z, AA, and are reprinted here essentially verbatim. Appellant does not include *any* legal analysis or argument in support of these claims; accordingly, he has waived review of them.

**CONCLUSION**

Having rejected all of appellant's claims for relief, we are required to affirm the sentence of death unless we determine:

 (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

 (ii) the evidence fails to support the finding of at least one aggravating circumstance specified....

42 Pa.C.S. § 9711(h)(3)(i)-(ii). First, the record is clear the sentence was not the product of passion, prejudice, or any other arbitrary factor. Second, the evidence was sufficient to support both of the aggravating circumstances found by the jury, *i.e.*, the killing occurred during the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and appellant created a grave risk of death to someone other than the victim during the killing. *Id.*, § 9711(d)(7).

Appellant concludes by claiming he did not have an unbiased jury or a fair trial due to the cumulative effect of all the alleged errors. However, where a claimant has failed to prove prejudice as the result of any individual errors, he cannot prevail on a cumulative effect claim unless he demonstrates how the particular cumulation requires a different analysis. *See Commonwealth v. Michael,* 562 Pa. 356, 755 A.2d 1274, 1281 (2000) (citing *Commonwealth v. McGill,* 545 Pa. 180, 680 A.2d 1131, 1136 (1996) (there can be no cumulative effect of prejudice when there was no harm in first instance)). Accordingly, appellant's claim fails.

Accordingly, we affirm the verdict and sentence of death. Jurisdiction relinquished.[27]

---

**27.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).

Former Chief Justice CAPPY and former Justices NIGRO and NEWMAN did not participate in the decision of this case.

Chief Justice CASTILLE joins the opinion.

Justice SAYLOR files a concurring opinion.

Justice BAER files a concurring opinion.

Justice SAYLOR, concurring.

I join the majority opinion, subject to the following reservations.

I have difficulty with the majority's approach to the degree to which it approves of a prosecutor's practice of discussing the perspective of uncalled, supportive witnesses. *See* Majority Opinion, at 327–29, 961 A.2d at 153–54. I would specifically disapprove such practice and would rest the disposition of this claim upon a finding of insufficient prejudice.

With regard to the treatment of Appellant's claim deriving from his argument that criminal trespass does not qualify to support the in-perpetration-of-a-felony aggravator, *see* Majority Opinion at 333–34, 961 A.2d at 156–57, I note that Appellant's argument recently was rejected by a majority of this Court in *Commonwealth v. Robinson*, 583 Pa. 358, 379–81, 877 A.2d 433, 445–46 (2005). I regard *Robinson* as governing precedent, albeit I held a contrary view. *See id.* at 392–99, 877 A.2d at 453–58 (Saylor, J., dissenting).

Justice BAER, concurring.

I join the Majority Opinion in full, with the exception of two points. My first concern arises from footnote 22. I agree with the observation that "post-verdict motions should not become an accepted repository for laundry lists of collateral-appropriate complaints...." Maj. at 320, 961 A.2d at 148 (quoting *Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1032–33 (2007)) (Castille, J., concurring, joined by Saylor, J., concurring). Nevertheless, this Court has previously provided an exception to the holding in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), delaying claims of counsel ineffec-

tiveness until PCRA review, and allowed review of claims of ineffectiveness on direct appeal that were raised and addressed by the trial court on post-verdict motions, *see, Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003). The Court, however, has never held that such process would result in waiver of subsequent full PCRA review. To the extent that footnote 22 attempts to change our jurisprudence *in dicta* supported only by cites to two concurring opinions, I respectfully disagree. I believe our established case law permits the review of claims under the *Bomar* exception without affecting a defendant's right to seek PCRA relief. Of course, in accordance with well-established judicial principles, claims that have been previously litigated at the time the PCRA is filed are barred. 42 Pa.C.S. § 9543(a)(3).

I also write separately to express my disagreement with the Majority's assessment of the harmlessness of the prosecutor's violation of Appellant's right to silence. While the Majority characterizes its assessment as "not a close case," Maj. at 313, 961 A.2d at 144, I view the matter as extremely tenuous. This is especially so given this Court's longstanding protection of the right to silence and the stringent standards we have set forth for a finding harmless a violation of that right. Nonetheless, in respect for this Court's prior decisions, I join the Court's denial of relief to Appellant.

I join in full the Majority's presentation of the law and the determination that the prosecutor's references in this case constituted a violation of Appellant's right to silence. Maj. at 311–12, 961 A.2d at 143. Indeed, it is difficult to imagine a more direct reference to a defendant's decision not to testify than the statements made by the prosecutor in this case. This is not a case where there is an implied reference to the decision to remain silent; nor is there any confusion whether the silence referenced was pre-arrest, rather than the vigilantly protected post-arrest silence.

As recounted by the Majority, the defense's theory of this case is that Mrs. Mowery, wife of the victim, killed her husband and framed Appellant. Ultimately, the jury's determination of whether the defense's theory created reasonable

doubt was dependent upon the credibility of Mrs. Mowery and implicitly the credibility of the story Appellant's defense put forth, in light of all of the evidence. In his closing argument, the prosecutor discredited the defense's version of what occurred inside the house by noting that the "two best Commonwealth witnesses here are the two that didn't testify in person." He made it clear that the decedent was "not here to face ya [sic] and tell you that in person" because he had been murdered, leaving the jury to wonder why Appellant, as the only other person who was in the home when the murder occurred, did not testify to contradict Mrs. Mowery, and in support of his own defense's story.

We have previously been reluctant to find error harmless based upon overwhelming evidence and stated that such a finding should not be arrived at lightly. *See Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155, 166 (1978); *Commonwealth v. Davis,* 452 Pa. 171, 305 A.2d 715, 720 (1973). We have noted that "it is far worse to conclude incorrectly that the error was harmless than it is to conclude incorrectly that the error was reversible." *Davis,* 305 A.2d at 719. Overwhelming evidence, furthermore, cannot cure an error that may have contributed to the verdict:

If there is a finding that the improperly admitted evidence could have contributed to the verdict, then the error cannot be harmless regardless of the overwhelming and uncontradicted evidence of guilt. It is impossible to determine that there is a possibility that the error contributed to the verdict, and at the same time determine that the error was harmless. The two findings are mutually exclusive.

*Commonwealth v. Rodriguez,* 533 Pa. 555, 626 A.2d 141, 145 (1993). To render an error harmless based upon overwhelming evidence, "the properly admitted and *uncontradicted* evidence of guilt [must be] so overwhelming and the prejudicial effect of the error ... so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Young,* 561 Pa. 34, 748 A.2d 166, 193 (1999) (emphasis added).

▆▆▆▆▆▆▆▆

The Majority correctly observes that this case contained substantial evidence pointing toward Appellant; unlike the Majority, however, I pause before finding the evidence "overwhelming" because of the substantial prejudice accompanying the overt reference by the prosecution and the requirement in our caselaw that we consider only the uncontradicted evidence before concluding that the prosecutor's error was harmless. As noted above, Appellant's counsel contradicted the basic premise of the Commonwealth case by challenging Mrs. Mowery's account of the events that occurred inside the Mowery home between the time of the argument in the yard prior to 6:00 a.m. and the time of Mrs. Mowery's phone call to 911 at 6:49.[1] Furthermore, counsel challenged the authenticity of Appellant's alleged confession by noting inconsistencies in the officers' reports. Nonetheless, the uncontradicted evidence includes the 911 calls that establish a six-minute window of time beginning with Appellant shooting his way into the Mowery home and ending with Mrs. Mowery calling to report the murder, the trail of Appellant's blood from the door to the murder scene of the bedroom, and the evidence of the police chase tracking Appellant's immediate flight from the house after the murder by himself and his arrest with the murder weapon, which had his own blood on the clip.

Accordingly, the question in this case is whether the references to Appellant's failure to take the witness stand, and the shadow we can presume it cast on the defense theory that Mrs. Mowery killed her husband and framed Appellant, may have been what ultimately tipped the scales in the Commonwealth's favor. This Court was faced with a similar quandary in *Commonwealth v. Mitchell*, 576 Pa. 258, 839 A.2d 202 (2003), where the defendant contradicted the narrative of the shooting. In that case, we noted that the uncontradicted evidence established the defendant's presence at the scene, the events preceding the shooting that provided the defendant a motive to harm the victims, and the defendant's flight from

1. I note that the Court need not conclude that the defense theory is credible to determine that the evidence is not overwhelming. *See Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166, 194 n. 16.

police.[2] Although the reference to Appellant's right not to testify was more overt in this case than the reference in *Mitchell*, which could have been interpreted to reference pre-arrest silence, the uncontradicted evidence in this case is more substantial. Accordingly, following, as I must, the precedent established in *Mitchell*, I somewhat hesitatingly join the denial of relief in this case based upon my conclusion that the uncontradicted evidence of guilt was sufficiently overwhelming that the prejudicial effect of the prosecutor's comments did not contribute to the verdict.

In all other respects, I join the decision of the Majority.

---

**2.** Justice Saylor authored a compelling dissent in *Mitchell* noting his view that *Mitchell* constituted a "dilution of the harmless error standard which the Court took pains to apply correctly in *Young*." *Mitchell*, 839 A.2d at 218