J-S31008-20
J-S31009-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KENT OTTO HARTFORD | : | No. 1844 MDA 2019 |

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0000338-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHENANE LYNEA RIECO | : | No. 1858 MDA 2019 |

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0000209-2018

BEFORE:  BOWES, J., DUBOW, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 26, 2020**

The Commonwealth appeals from the October 17, 2019 order granting

a pre-trial motion to suppress filed by Kent Otto Hartford ("Mr. Hartford") at

docket number CP-22-CR-0000338-2018, and joined by co-defendant,

Shenane Rieco ("Ms. Rieco") (collectively, the "Defendants"), at docket number CP-22-CR-0000209-2018.[1]  After careful review, we affirm.

The trial court has authored a cogent and thorough summary of the underlying factual circumstances of this case:

> On January 3, 2018, Aishah Calloway (hereinafter "Ms. Calloway"), a caseworker with Dauphin County Children and Youth Services (hereinafter, "DCCYS"), received a voicemail at approximately 1:48 P.M. from a nurse at Women's Outreach Facility stating that [the Defendants] were at the office for [an appointment with their child] and Ms. Rieco appeared to be under the influence.  Ms. Calloway had previously been involved with the family on two (2) prior occasions in 2017.  However, on January 3, 2018, she was no longer working with the family, and she had previously informed [Mr. Hartford] that she was leaving DCCYS and that her last day would be on December 21, 2017.  Additionally, the child was permitted to reside with [Mr. Hartford] and Ms. Rieco in their residence so long as DCCYS was able to perform two (2) unannounced visits per week.
>
> . . . .  When Ms. Calloway received the voicemail from the nurse at Women's Outreach, she contacted the supervisor of the ongoing caseworker, Heather Gutshall (hereinafter "Ms. Gutshall") assigned to the family.  Since the ongoing caseworker was out of the office on vacation, Ms. Gutshall asked Ms. Calloway to call the nurse back for further information.  Ms. Calloway called the nurse and was informed that Ms. Rieco's behavior appeared more erratic than normal and at one point during the appointment the nurse had to hold the child tighter because Ms. Rieco bumped into her and almost knocked the child out of her hands.  The nurse did not

---

[1]  The above-captioned appeals stem from the same events, and the charges against the Defendants are identical.  Moreover, the issues and arguments raised by the Commonwealth in both cases are identical.  Accordingly, we have *sua sponte* consolidated these appeals for the sake of judicial efficiency.  *See* Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").

indicate how long she observed Ms. Rieco nor whether she had any conversations with Ms. Rieco. [Mr. Hartford] was also present at the appointment and there were no concerns with his appearance or behavior.

Ms. Calloway then relayed the information she received from the nurse to Ms. Gutshall, who requested that she go to the home. **While on her way to the residence**, Ms. Calloway contacted Detective Ashley Baluh (hereinafter, "Detective Baluh") of the Swatara Township Police Department to inform her of the call from the nurse and that she was on her way to [Mr. Hartford's] residence. Detective Baluh stated she would send a patrol unit to assist Ms. Calloway.

Ms. Calloway arrived at [Mr. Hartford's] residence on or about 3:25 P.M. She knocked on the door, identified herself and stated that the ongoing caseworker was out of the office. No one answered the door. However, Ms. Calloway testified that she heard someone whisper "don't open the door[,]" but was unable to state whether the voice was male or female. Ms. Calloway attempted to contact [Mr. Hartford] and left him a voicemail stating that she was there for a visit and was outside the home and could hear voices coming from inside. She then called Ms. Rieco and left a similar voicemail. At some point, two (2) patrol officers arrived on scene. One of the officers ran the license plate of a vehicle parked in front of the residence, which was registered to [Mr. Hartford]. The hood of the vehicle was still warm.

Ms. Calloway sent another text message to [Mr. Hartford] stating that she [was] outside the residence, [and could] hear them moving inside. She then **contacted police to gain access** to the home. [Mr. Hartford] responded via text message that he, Ms. Rieco and the child were not home and had left for Tioga County from their appointment. Ms. Calloway responded via text message that the police were on the way to verify – [Mr. Hartford] never responded.

At some point, [Mr. Hartford] called DCCYS and was essentially on a conference call with Matthew Wallace, Ms. Calloway's supervisor, Richard Vukmanic, DCCYS assistant administrator, and Michelle Rush, DCCYS director. Ms. Calloway was informed that [Mr. Hartford] initially stated that they left from the appointment for Tioga County and when challenged, changed his story to state that they never returned home to drop the vehicle

off because someone else picked them up. After being at the home for some time with no success o[f] making contact with [Mr. Hartford] or the child, Ms. Calloway contacted Detective Baluh who stated that she would contact the District Attorney.

Detective Baluh arrived on the scene between 3:54 P.M. and 4:14 P.M. Detective Baluh was also involved with the family on the same two (2) prior occasions that Ms. Calloway described. Prior to her arrival, Detective Baluh had contacted Mr. Mann from Pennsylvania Probation and Parole, who supervises [Mr. Hartford], to see if he could get in contact with [Mr. Hartford] and persuade him to open the door. She spoke with Mr. Mann a second time to see if he was able to get ahold of [Mr. Hartford]. [Mr. Mann] was unable to reach [Mr. Hartford], but stated that if his vehicle was there then they were home. Detective Baluh then informed Mr. Mann what the nurse had reported and he responded that it made sense to him because [Mr. Hartford] was using again. She did not ask Mr. Mann the timeframe of when he believed [Mr. Hartford] was using nor did she ask what drug he was allegedly using. Detective Baluh assumed [Mr. Hartford] was using at that time because Mr. Mann used the present tense.

Detective Baluh testified that the decision to force entry into the residence was made at 6:29 P.M. – almost three (3) hours after Ms. Calloway's arrival at the residence. The decision was based on the information from the nurse (that Ms. Rieco was under the influence and *almost* knocked the child out of the nurse's arm[s]), that [Mr. Hartford] was lying about their whereabouts, the comment by Mr. Mann that [Mr. Hartford] was "using again," and the two prior contacts with the family in 2017. After officers forced entry intro the home, Detective Baluh went inside to locate the child, but was unsuccessful. However, Detective Baluh noted that the apartment was warm, the television was on, and there was evidence that baby bottles had been recently made. Ms. Calloway then informed her that [Mr. Hartford] had previously told her that there is a hidden door that connects their apartment to the apartment next door. The [hidden] door was eventually located and [Mr. Hartford], Ms. Rieco, and the child were located huddled in the corner under the door. Detective Baluh then made the decision to take the child into protective custody.

Trial Court Opinion, 12/13/19, at 2-6 (internal citations, quotation marks, and

footnotes omitted; emphasis in original).

As a result of these above-described events, the Defendants were individually charged with intimidation or obstruction in a child abuse case and endangering the welfare of children. The Dauphin County Public Defender's Office represented Ms. Rieco, and conflict counsel was appointed to represent Mr. Hartford. On June 28, 2019, the Defendants filed an omnibus pre-trial motion arguing, *inter alia*, that the warrantless entry into their apartment by law enforcement was unconstitutional and not properly supported by either probable cause or exigent circumstances. **See** Mr. Hartford's Omnibus Pre-Trial Motion, 6/28/19, at ¶¶ 1-10; **see also** N.T. Suppression Hearing, 8/22/19, at 3. Consequently, the Defendants requested the suppression of "virtually all evidence obtained by [DCCYS] and/or law enforcement." **Id**. at ¶ 10.

On August 22, 2019, the trial court held a hearing on Mr. Hartford's suppression motion at which Ms. Calloway, Detective Baluh, and Lieutenant Timothy Shatto testified for the Commonwealth. **See** N.T. Suppression Hearing, 8/22/19, at 5-73. On October 17, 2019, the trial court granted Mr. Hartford's suppression motion, holding as follows:

> [T]he Commonwealth failed to prove sufficient exigent circumstances to justify the warrantless entry into the home. The evidence adduced at the pretrial hearing indicates that there was ample time for law enforcement to obtain a search warrant for the residence from a neutral and detached magistrate. Further, there was insufficient evidence to prove the existence of an imminent threat of harm. Therefore, all evidence obtained from the illegal entry into the residence is hereby **SUPPRESSED**.

Order, 10/17/19, at 1. On November 12, 2019, the Commonwealth filed a timely notice of appeal.[2] The trial court did not order the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and no such statement was filed. Nonetheless, the trial court authored a comprehensive Rule 1925(a) opinion.

The Commonwealth has raised a single issue for our consideration: "Whether the lower court erred in granting [Mr. Hartford's] pretrial motion to suppress where law enforcement officers possessed probable cause and exigent circumstances to enter the house, and were also acting pursuant to the public servant exception to the community caretaking doctrine?" Commonwealth's brief at 4 (unnecessary capitalization omitted).

Our standard and scope of review in this context are well-established:

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

***Commonwealth v. Korn***, 139 A.3d 249, 252-53 (Pa.Super. 2016). Thus, "[o]ur standard of review is restricted to establishing whether the record

---

[2] Pursuant to Pa.R.A.P. 904(e), the Commonwealth certified that the order substantially handicapped the prosecution.

- 6 -

supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions." **Id**. at 253.

Both the U.S. Constitution and the Pennsylvania Constitution guarantee an individual's freedom from unreasonable searches and seizures. **See** U.S. CONST. Art. IV, PA. CONST. Art. I, § 8. This case arose in the context of an investigation of suspected child abuse being conducted by Ms. Calloway on behalf of DCCYS. This Court has held that the relevant constitutional protections against unreasonable searches and seizures applies equally "to an investigation by a children and youth agency caseworker." **In re Petition to Compel Cooperation with Child Abuse Investigation**, 875 A.2d 365, 373-74 (Pa.Super. 2005). Consequently, "[i]n a private home, searches and seizures without a warrant are presumptively unreasonable[.]" **Commonwealth v. Roland**, 637 A.2d 269, (Pa. 1994).

The following legal principles guide our review:

> "The law of search and seizure remains focused on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime." **Commonwealth v. Bostick**, 958 A.2d 543, 556 (Pa.Super.2008) (citations and quotations marks omitted). It is well established that "probable cause alone will not support a warrantless search or arrest in a residence . . . unless some exception to the warrant requirement is also present . . . . [A]bsent consent or exigent circumstances, private homes may not be constitutionally entered to conduct a search or to effectuate an arrest without a warrant, even where probable cause exists." **Commonwealth v. Santiago**, 736 A.2d 624, 631 (Pa.Super.1999) . . . .

*Commonwealth v. Johnson*, 68 A.3d 930, 935-36 (Pa.Super. 2013). "Thus, a dual inquiry, both parts requiring affirmative answers[,] must be made: first, whether there existed probable cause to search; and secondly, whether exigent circumstances can be found to excuse the obtaining of a warrant." *Commonwealth v. Wright*, 961 A.2d 119, 137 (Pa. 2008) (internal citation and quotation marks omitted).[3]

The Commonwealth's substantive argument is succinct:

Commonwealth respectfully submits that law enforcement officers not only possessed probable cause and exigent circumstances to justify their entry, but also were justified under the public servant exception to the community caretaking doctrine where they were able to point to specific, objective, and articulable facts that reasonable suggested to the experienced officers that the child was in need of assistance due to her parents' intoxication. This was supported by their deceptive claims in multiple phone calls/text messages, their increasingly erratic behavior, and the officer's knowledge of [the Defendants'] previous endangering behavior towards [the child].[4] Upon learning from Agent Mann that [Mr.] Hartford was "using again," it became clear that immediate entry into the home was necessary to ensure the safety of [the child]. Probable cause and exigent circumstances concerning [the child's] safety existed to allow for warrantless

---

[3] We also note that "[t]he expectation of privacy protected [by] the United States and Pennsylvania Constitutions has been held to be greatest in one's home." *Commonwealth v. Johnson*, 68 A.3d 930, 936 (Pa.Super. 2013) (internal citations and quotation marks omitted).

[4] The only evidence presented at the suppression hearing regarding the Defendants' "endangering behavior" was that the child had previously suffered a broken arm, which was the result of the Defendants' negligent supervision. *See* N.T. Suppression Hearing, 8/22/19, at 6-7, 19-20. Thereafter, there was a second incident involving the child being in Defendants' custody while she was supposed to be in Tioga County with her maternal grandmother. *Id*. at 9. On January 3, 2018, the child was properly in the Defendants' custody.

police entry into the [Defendants'] home given the information [Detective] Baluh knew at the time of entry.

Commonwealth's brief at 14-15. We disagree.

In its Rule 1925(a) opinion, the trial court concluded that the Commonwealth failed to establish either probable cause or exigent circumstances to justify their warrantless entry into the Defendants' home. **See** Trial Court Opinion, 12/13/19, at 10-11. We begin by reviewing the trial court's conclusion that the Commonwealth lacked probable cause to suspect child abuse in the instant case. **Accord Wright**, **supra** at 137. For our purposes, probable cause exists "where the facts and circumstances within the officer's knowledge are sufficient to warrant person of reasonable caution in the belief that an offense has been or is being committed." **Commonwealth v. Hernandez**, 935 A.2d 1275, 1284 (Pa. 2007). This inquiry requires us to view the totality of the circumstances presented. **Id**.

The trial court discussed probable cause, as follows:

The only allegation received by DCCYS was that [the Defendants] were present for the child's medical appointment and Ms. Rieco appeared to be under the influence and bumped into a nurse who was holding the child. Further, there was no specificity as to the degree of Ms. Rieco's impairment or how such impairment caused the child to be abused or neglected. There was also no testimony that there was a link between the alleged abuse/neglect and [Mr. Hartford's] home. Notably, there were no reported concerns regarding [Mr. Hartford], who was also present for the appointment.

Trial Court Opinion, 12/13/19, at 10.

This assessment is fully supported by the certified record. The only testimony directly speaking to potential child abuse in this case was the report that Ms. Rieco's behavior was "more erratic" than usual during a medical appointment, and that she had "almost knocked [the child] out of the nurse's hands." *See* N.T. Suppression Hearing, 8/22/19, at 11. This report may have raised some colorable suspicion that Ms. Rieco was intoxicated while in the presence of the child, but it was not sufficient to establish probable cause of child abuse.[5] Specifically, we find this case fairly analogous to *Interest of D.R.*, 216 A.3d 286 (Pa.Super. 2019).[6]

In that case, Fayette County Children and Youth Services Agency ("CYS"), "received three separate reports of Father being under the influence of an unknown substance," including one instance when he "was accompanied

---

[5] Where "[a] subject of the report of suspected child abuse refuses to cooperate with the county agency in an investigation, and the county agency is unable to determine whether the child is at risk," the proper remedy is to petition the court. *See* 55 Pa. Code § 3490.73(2); *see also In re Petition to Compel Cooperation with Child Abuse Investigation*, 875 A.2d 365, 377 (Pa.Super. 2005) ("As we interpret the statute and agency regulations, [the county agency] must file a verified petition alleging facts amounting to probable cause to believe that an act of child abuse or neglect has occurred and evidence relating to such abuse will be found in the home."). Instantly, the Commonwealth did not file any such petition.

[6] *Interest of D.R.*, 216 A.3d 286 (Pa.Super. 2019), does not arise in the context of a warrantless entry into a home by law enforcement. As discussed further *infra*, it concerns whether probable cause existed to compel an involuntary home inspection. We read this case for the limited proposition that mere allegations of a parent's intoxication in the presence of a child do not, alone, give rise to probable cause of child abuse.

- 10 -

by one of his five children." *Id*. at 289. CYS was unable to corroborate these allegations, but sought to compel both parents to submit to, *inter alia*, an involuntary home inspection. Thereafter, the court of common pleas directed the parents to comply with the involuntary home inspection or face sanctions.

On appeal, this Court concluded that CYS could not demonstrate probable cause to suspect child abuse based upon the uncorroborated allegations of Father's intoxication:

> [CYS] did not allege sufficient facts to warrant compelled compliance. Here, while there were three separate reports regarding Father's alleged intoxication, none contained any specificity regarding the degree or type of impairment, nor alleged how such impairment caused any of the children to be abused or neglected.
>
> . . .
>
> [CYS] did not allege any concerns with Mother, . . . . And critically, [CYS] did not allege a link between the alleged abuse/neglect and the parents' home. Nor did [CYS] allege exigent circumstances; in fact, the allegations were months old. It appears here that CYS merely sought compliance so that they could close the investigation.

*Id*. at 295. Thus, we concluded that "[t]hese facts do not constitute a sufficient foundation for a finding of probable child abuse[.]" *Id*.

The instant allegations concerning Ms. Rieco that formed the basis for the Commonwealth's claim of probable cause are strikingly similar to those that we disapproved of in *Interest of D.R.* At a basic level, the nature and extent of Ms. Rieco's alleged intoxication was not described with any specificity by the reporting party. *See* N.T. Suppression Hearing, 8/22/19, at 10-11

- 11 -

(stating only that Ms. Rieco "appeared to be under the influence" during the child's appointment). More importantly, there was no evident connection between Ms. Rieco's alleged intoxication and the immediate concerns of child abuse. *Id*. at 11 (stating that the caller just wanted to "ensure that the child was safe," but failing to articulate how the child was in danger). Mere concern about Ms. Rieco jostling the nurse is not indicative of any immediate danger to the child, particularly where another parent is present.[7]

Based upon the foregoing discussion, we discern no legal error or abuse of discretion in the trial court's conclusion that there was no probable cause to support the at-issue warrantless entry. *Accord Interest of D.R.*, *supra* at 295; *see also In re Petition to Compel Cooperation with Child Abuse Investigation*, 875 A.2d 365, 378 (Pa.Super. 2005) (concluding that an uncorroborated telephone tip alleging potential child abuse was "insufficient" to compel parents "to submit to a search of their home"). In the absence of probable cause, the warrantless entry in this case cannot be ratified under Pennsylvania law.[8] *Accord Wright*, *supra* at 137.

---

[7] The only allegation related to Mr. Hartford's alleged drug use was Mr. Mann's statement to Detective Baluh that he was "using" an unspecified substance. *See* N.T. Suppression Hearing, 8/22/19, at 49. There was no allegation or suggestion that Mr. Hartford was intoxicated on the day in question.

[8] As a result of the nature our holding, we need not assess whether exigent circumstances existed in this case. However, we note that the Defendants' "deceptive claims" and "erratic behavior" concerning their whereabouts only began once law enforcement and DCCYS began to demand entry into their

Setting aside the threadbare probable cause in this case, the Commonwealth has argued in the alternative that the "emergency aid doctrine" to the "community-caretaking doctrine" should apply in these circumstances. This doctrine was recognized by our Supreme Court in *Commonwealth v. Livingstone*, 174 A.3d 609 (Pa. 2017), and permits "certain warrantless actions by police officers" so long as they are motivated by "a desire to render aid or assistance, rather than the investigation of criminal activity." *Commonwealth v. Schneider*, ____ A.3d ____, 2020 WL 5405426 (Pa.Super. 2020). In order for this exception to apply, two elements must be established: (1) "police officers must be able to point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance"; and (2) "the police caretaking action must be independent from the detection, investigation, and acquisition of criminal evidence." *Commonwealth v. Edwards*, 194 A.3d 625, 633-34 (Pa.Super. 2018). Neither prong has been satisfied here.

As discussed above, there are few indicia of an emergency in this case. Viewed in the proper light, the facts available to law enforcement merely suggested that Ms. Reico may have been intoxicated in the presence of child

---

home without a warrant. "Police cannot rely upon exigent circumstances to justify a warrantless entry where the exigency derives from their own actions." *Commonwealth v. Duke*, 208 A.3d 465, 470 (Pa.Super. 2019).

earlier that day. There was simply nothing in the situation to objectively suggest that immediate and emergency intervention was necessary.

Even assuming, *arguendo*, that the first element is satisfied, the investigation in this matter was motivated, at least in part, by a desire to investigate suspected narcotics use by the Defendants. Indeed, it was only after suspicions were raised regarding both Defendants' suspected drug use that a decision was made to breach the Defendants' home. ***See*** N.T. Suppression Hearing, 8/22/19, at 49-50.

Moreover, the Commonwealth's arguments concerning emergency and exigency are conclusively belied by the timeline of events in this case. If the Commonwealth objectively believed that the child was in immediate danger and required assistance, why did the officers and officials wait nearly three hours before forcing their way into the Defendants' apartment? During that time, the Commonwealth did not learn any new information regarding the child's status to suggest immediate danger. It is entirely unclear why the Commonwealth did not simply seek a search warrant from a neutral magistrate, or petition for a court order of compliance. ***Accord In re Petition to Compel Cooperation with Child Abuse Investigation***, ***supra*** at 380 ("[The county agency's] responsibilities . . . to investigate each and every allegation of child abuse/neglect . . . do not trump an individual's constitutional rights under the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution.").

No relief is due on the Commonwealth's claim.

Order affirmed.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/26/2020